40 A.3d 1127

**Nicole LEAKE, et al.**

v.

**Dondi JOHNSON, Jr., et al.**

**No. 2607, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

March 30, 2012.

William R. Phelan, Jr. (George A. Nilson, City Solicitor, on the brief), Baltimore, MD, for appellant.

Byron L. Warnken (James M. Nichols, Warnken, LLC, on the brief), Towson, MD, for appellee.

Panel: ZARNOCH, GRAEFF, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

GRAEFF, J.

This appeal involves litigation arising from the death of Dondi Johnson, Sr., after he was arrested for public urination. Appellees, and cross-appellants, Mr. Johnson's estate and his two sons,[1] filed a wrongful death and survivorship action in the Circuit Court for Baltimore City against appellants, Officers Sendy Ferdinand, Michael Riser, and Nicole Leake. A jury found in favor of appellees, and the circuit court entered judgment in the amount of $416,500.

Both parties appeal from the order of the Circuit Court for Baltimore City. Appellants present two questions for our review,[2] and appellees present six questions.[3] We have consolidated and reworded the questions presented as follows:

---

**1.** Appellees are Dondi Johnson, Jr. and Andrea Scott, Co–Personal Representatives of the Estate of Dondi Johnson, Sr., Dondi Johnson, Jr., Individually, and Andrea Scott, Mother and Next Friend of De'Andre Johnson.

**2.** Appellants present the following questions:
   1. Did the lower court err in denying the officers' defense of public official immunity, where the officers performed discretionary acts, without malice, in carrying out their official, law enforcement duties?
   2. Did the lower court err in ruling, for purposes of damage limitation statutes, that there were three individual claims, when the wrongful death claims were derivative of the injury to Mr. Johnson?

**3.** Appellees present the following six questions for our review:
   1. Whether a party is precluded from seeking JNOV based on public official immunity after failing to make that argument in the Motion for Judgment following the close of all the evidence, as required by Md. Rule 2-532?

1.  Did the circuit court properly deny the officers' motions for judgment notwithstanding the verdict?

2.  Did the circuit court err in ruling, pursuant to the limitation of liability in the Local Government Tort Claims Act, that the case involved three individual claims and one occurrence?

For the reasons set forth below, we shall answer both questions in the affirmative, and therefore, we will affirm in part, and reverse in part, the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 27, 2008, appellees filed a Complaint in the Circuit Court for Baltimore City, naming Officers Sendy Ferdinand, Nicole Leake, and Michael Riser as defendants. In their Complaint, appellees raised multiple claims, including battery, negligence, gross negligence, and two counts of wrongful death. They asserted that Mr. Johnson was arrested for public urination, handcuffed, and placed into a police van, where appellants "maliciously failed to belt [Mr. Johnson] into the paddy wagon/police van's seat so that he was subject to being violently thrown around the back of the vehicle as the Defendant Leake drove in an aggressive fashion, taking turns

2.  Whether a police officer is entitled to public official immunity when the tortious acts were ministerial tasks involving operation of a motor vehicle and the violation of mandatory police policies?

3.  Whether a police officer's duty to provide medical treatment and avoid aggravation of an arrestee's injury, as mandated by police policy, are ministerial acts involving no discretion as to the exercise of the State's sovereign power?

4.  Whether a special relationship exists between an arrestee and the police when the officers deny all means of self-protection by placing the arrestee in handcuffs and a binding General Order requires that officers ensure the safety of the arrestee?

5.  Whether a judgment is enforceable against a governmental employer when the individual employees posses[s] public official immunity?

6.  Whether, under the LGTCA, (a) the number of "individual claims" is determined by the number of plaintiffs who may bring a cause of action, and (b) the number of "occurrences" is determined by reference to the number of proximate causes giving rise to the victim's injuries?

so as to injure [Mr. Johnson] who was helplessly cuffed." The Complaint further stated:

> After having inflicted permanent, serious and life threatening injuries to [Mr. Johnson], these Defendants made no attempts whatsoever to administer first aid or medical care. Specifically, notwithstanding [Mr. Johnson's] complaints of numbness and an inability to move, these Defendants failed to immobilize [Mr. Johnson's] neck, failed to obtain emergency medical assistance, and simply transported [Mr. Johnson] from the back of the paddy wagon/police van to another police vehicle, unsecured and without adequate stabilization, after he had sustained significant injury. Thereafter, they drove him, unsecured and unstabilized, to the hospital.

On December 8, 2008, Officer Leake filed an answer to the complaint. In her answer, she generally denied liability and asserted a number of affirmative defenses. She claimed that her "allegedly wrongful acts were justified and privileged"; she was "immune from liability"; and she "acted reasonably and with good faith belief that [her] actions were lawful and proper." She further asserted that "[t]he injuries or damages complained of resulted from acts or omissions of others for which [she] cannot be held legally responsible" and that "[a]ny damages that may be recovered are limited by law."

On January 9, 2009, Officers Riser and Ferdinand filed answers to the complaint. They asserted, among other things, that as members of the Baltimore City Police Department (the "Department"), they were "entitled to public official immunity." The officers stated that "[t]he touching of the Plaintiff by the Defendant as alleged in the complaint did not occur." Each officer stated that he "acted reasonably under the circumstances and in good faith." Each officer also asserted that "Plaintiff has failed to comply with the required notice provisions of the Local Government Tort Claims Act," and that "Plaintiffs' claim exceeds the cap on damages under the LGTCA."

Trial commenced on March 25, 2010. Charles J. Key, a former member of the Department, testified as an expert in police policies and procedures. When he worked at the Department, Mr. Key trained officers regarding the use of legal force, and he wrote the General Order regarding the use of force. Mr. Key testified that "[a] General Order is a mandate from the agency that a police officer will act in certain circumstances or situations in a specific way. It mandates their conduct."

The parties stipulated that General Order K14, which deals with persons in police custody, was related to the case. General Order K–14 states:

> Whenever a person is taken into custody, ensure the safety of the arrestee and ensure medical treatment for a prisoner is obtained when necessary at the nearest emergency medical facility.
>
> \* \* \*
>
> [W]henever an arrestee is transported in a police vehicle ensure ... [t]he arrestee is secured with seat restraint belts provided. This procedure should be evaluated on an individual basis so not to place oneself in any danger.

Mr. Key testified that officers transporting a prisoner "have the responsibility of ensuring the safety and well-being of the individual, providing medical care or an access to medical care if necessary. And then the transporting officer has the additional responsibility of seatbelting the individual in." The only exception to the requirement of belting an arrestee with a seatbelt is officer safety. Mr. Key explained that this exception applies in circumstances where the officer reasonably believes he or she could be placed in danger.

Mr. Key also testified about the term "rough ride." It is a police term for "an unsanctioned technique" where the driver of a prisoner transport vehicle "would drive in such a manner that caused injury or pain to the individual in the back of the wagon."

Baltimore City police officers are trained as "first responders." Mr. Key explained that a "[f]irst responder is an individual that's trained to a level in first aid that will allow them to give first aid to people that are injured," and that, upon arriving on the scene of an injury, they have a duty "to assess the injury of the individual and provide appropriate first aid for that specific injury until the arrival of medical personnel." General Order K–14 states that, "upon arresting a person who is ill or seriously injured," an officer should "administer first aid." If the first aid that is required is beyond the skill or ability of a first responder, then the officer should "[s]tabilize [the arrestee] to the point that their training would allow them and then call for an ambulance." Order K–14 also mandates that the officer write a report regarding the injury.

Officer Leake testified that, on November 23, 2005, she received a call to transport an arrestee from the intersection of Pimlico Road and Loyola Southway in Baltimore City. She picked up Mr. Johnson between 4:00 p.m. and 6:00 p.m. His hands were cuffed behind his back. The van she drove had a door in the back and hard plastic benches on both sides, facing each other. Mr. Johnson stepped into the van himself and did not threaten any of the officers. Neither she, nor the other two officers, put a seatbelt on Mr. Johnson. While transporting Mr. Johnson, Officer Leake heard several bangs from the back of the van. At some point during the trip, Mr. Johnson moved toward the plexiglass divider at the front of the van and was "screaming at [Officer Leake] to get him to the bathroom." She decided to take Mr. Johnson to the Northwest District to use the restroom, and she told the arresting officers, Ferdinand and Riser, to follow her to the District. When she arrived at the District and opened the back door of the van, Mr. Johnson was lying on the floor of the van and could not move.

Officer Leake told the other officers to take Mr. Johnson out of the van. She did not call for medical assistance because Mr. Johnson did not ask for it, and she thought he was lying because "he was banging the whole route in the wagon and

yelling at the same time to get him to the bathroom." After Officers Ferdinand and Riser removed Mr. Johnson from the back of the van, Officer Leake got back into the van and drove to pick up another arrestee. She never wrote an incident report as required by Order K14.

During cross-examination, Officer Leake testified that she did not put a seatbelt on Mr. Johnson because he had been arrested for public urination, and Mr. Johnson repeatedly stated that he needed to go to the bathroom. She testified: "I did not seatbelt him in because I acting in good faith felt if I seatbelted him in and his bladder being below his waist would cause more harm to him since he had to go to the bathroom and expressed that to me on more than one occasion." She denied giving Mr. Johnson a "rough ride."

Officer Leake told the Internal Investigations Division that it took her approximately three minutes to drive from the arrest scene to the police station. After driving the route multiple times, however, Officer Leake acknowledged that the route takes eight to ten minutes, and to drive it in three to five minutes would require driving in excess of the speed limit.

Dr. Morris Marc Soriano, an expert in neurosurgery with special emphasis on the cervical spine, testified that he had reviewed Mr. Johnson's medical records. When Mr. Johnson arrived at Sinai Hospital, a tube was placed in Mr. Johnson's bladder, and there was no evidence of urine in his bladder. Mr. Johnson was diagnosed as a quadriplegic upon arrival "due to fractures of the bones [at] C–4 and 5" and "almost complete subluxation or dislocation of one bone forward on another bone." Dr. Soriano opined that this injury was caused by a "high amount of force, applied to his head and neck, directly down on his head. And a force such that it caused him to snap his head forward, bringing his chin down towards his chest, and to rotate ... his head to the right." He stated: "Mr. Johnson sustained a [hyperflexion], tipping his head severely forward with a high degree of force and acceleration, in combination with pressure applied to the top of his head going down through the spine." Dr. Soriano opined

that the immediate effect of the accident in the van "was at least partial paralysis." He noted that there was testimony from one of the officers that Mr. Johnson's body moved at some point during the transfer from the van to the police car, which Dr. Soriano stated "sort of tells you that there may have still been, or there likely was, still some function in the spinal cord at the immediate time of the fracture." He concluded: "I think he had a very severe spinal cord injury, but still possibly or probably had some function as of the time that they were pulling him out of the van." He opined that Officers Ferdinand and Riser likely exacerbated Mr. Johnson's injury when they carried him to their patrol car.

Although Mr. Johnson was suffering from paralysis, he was "capable of experiencing conscious pain." At the hospital, he complained of "10 out of 10 pain" and reported only partial relief when given morphine. Mr. Johnson's record indicated that he told his doctor " 'that he was handcuffed and the wagon made a sharp turn, [he] fell, hitting face first and [heard] a pop and blacked out.' "

Dr. Soriano testified regarding the care Mr. Johnson received at the hospital. He underwent surgery to try to reduce the fracture in his neck. Due to Mr. Johnson's paralysis, he was unable to bring fluids out of his lungs by coughing, and therefore, nurses had to suction the fluids out of his lungs with "a modified percutaneous tracheotomy" to try to prevent Mr. Johnson from developing pneumonia. Mr. Johnson also required an "inferior vena cava filter placement" to prevent blood clots that may have formed in his legs from reaching his heart or lungs. A feeding tube was placed in his stomach.

Mr. Johnson died in the hospital on December 7, 2005, two weeks after his arrest. His lungs filled up with fluid, and he died of pneumonia. Dr. Soriano opined that Mr. Johnson would have had a normal life expectancy in the absence of his injury after his arrest.

Officer Michael Riser testified that, on November 23, 2005, he arrested Mr. Johnson for public urination. When Officer Leake arrived to pick up Mr. Johnson, Officer Riser put flex

cuffs on Mr. Johnson. Mr. Johnson got into the back of the van without assistance. He obeyed the officers' commands, and he did not threaten any of the officers or act violently. After Officer Riser and Officer Ferdinand left the scene of the arrest, they received a call from Officer Leake that she was taking Mr. Johnson to the Northwest District. When Officer Riser arrived at the Northwest District, Officer Leake told him: "Get him out of my wagon." Mr. Johnson stated: "[T]he bitch was driving like an asshole, I fell and I can't move." Mr. Johnson was lying on the floor of the back of the van. Officer Riser asked Mr. Johnson to get up, but he replied that he could not move.

Officer Riser was trained as a first responder, and he had training in dealing with neck injuries. As a result of that training, as well as his experience responding to car accidents, he knew that "if someone has a suspected neck injury, the first thing you do is stabilize that patient," "you don't move that patient."

Officer Riser went into the van and used his flashlight to check Mr. Johnson for injuries. Mr. Johnson had not urinated on himself. Officer Riser got on the back step, reached under Mr. Johnson's arms, and picked him up. Officer Riser did not stabilize Mr. Johnson's neck prior to moving him. Mr. Johnson felt like dead weight and did not move his legs. Officer Ferdinand, who also had gone into the van, grabbed Mr. Johnson's legs, and they carried Mr. Johnson out of the van and put him in the back of the police car. Officer Riser put a seatbelt on Mr. Johnson, for Mr. Johnson's safety and because Order K 14 required him to do so. Officers Riser and Ferdinand then took Mr. Johnson to Sinai Hospital.

Officer Riser agreed that, "by not calling an ambulance" and not immobilizing Mr. Johnson's neck, he violated Order K14. He also did not write an injury report for Mr. Johnson.

Officer Leake did not indicate that she believed Mr. Johnson was injured, and Officer Riser did not believe Mr. Johnson's statement that he was injured. Officer Riser asked Mr. Johnson if he wanted "a medic," or if he wanted the officers to

take him to the hospital. Mr. Johnson replied: "Just take me to the hospital." Officer Riser testified that a prisoner faking an injury usually asks to be taken to the hospital. He stated that he did not intend to injure Mr. Johnson when he took him out of the transport van and drove him to the hospital. When they arrived at the hospital, the hospital staff brought a gurney to the police car, and the hospital staff put Mr. Johnson on the gurney and wheeled him into the hospital.

Officer Ferdinand testified that, on the night at issue, he arrested Mr. Johnson for public urination.[4] He left the scene of arrest before Officer Leake took Mr. Johnson, and he did not "see Officer Leake's wagon the entire trip from the point of the arrest to the northwest station." During his police career, Officer Ferdinand had received training with regard to moving people who had been in auto accidents.

Dr. Michael Woodhouse, an expert in biomechanical engineering with a specialty in the forces necessary to create neck and spine injury in vehicular accidents, testified that Mr. Johnson suffered "a fracture dislocation of C4 and C5 with fracture of the pedicel, bilateral fracture of the lamina." This type of injury was "the most unstable type of cervical spine injury that a human could sustain." In his opinion, based upon a reasonable degree of scientific probability, Mr. Johnson's injury was the result of vehicular forces that were "[e]xcessive, aggressive, significant." He characterized the amount of force necessary to cause this type of damage as that equal to "a small bomb [going] off in this man's neck." Dr. Woodhouse opined that, if Mr. Johnson had been wearing a seatbelt, or if the vehicle had been operated under normal driving conditions, Mr. Johnson would not have been injured. In Dr. Woodhouse's opinion, "given the nature and the extent of Mr. Johnson's injuries and the forces required to create them," "the van had to have been driven in an aggressive manner."

---

4. Mr. Johnson did not have identification at the scene and was given a citation at the hospital.

Detective Arthur Brummer, a member of the Baltimore City Police Department, investigated the circumstances surrounding the arrest of Mr. Johnson, including reviewing a surveillance video that depicted Mr. Johnson's arrival at the emergency room. He reviewed a video of Mr. Johnson's arrival at the Sinai Hospital emergency room on November 23, 2005. The surveillance video showed:

> The marked vehicle approaches, individuals exit the marked vehicle. Individual runs into the emergency room area, comes out with a wheelchair. The other individuals that exited the vehicle help take an individual out of the vehicle, placed the person inside of the wheelchair and bring the person in the wheelchair into the hospital for medical attention.

Andrea Scott, the mother of Dondi Johnson, Jr. and De'Andre Johnson, Mr. Johnson's children, testified regarding the children's relationship with their father. Mr. Johnson was a plumber, and he supported his sons and helped raise them. He spent time with his sons and had a close relationship with them.[5] The children grieved the loss of their father, and De'Andre's grades suffered after his father died.

After appellees rested their case, the officers argued that judgment should be entered in their favor. Officer Leake argued that she was entitled to judgment on the battery count and the gross negligence count because there was no showing of malice and "not putting a seatbelt on does not rise to the level of gross negligence." Officers Ferdinand and Riser similarly argued that the officers' actions did not rise to the level of battery or gross negligence. As to the count of wrongful death, counsel argued that the plaintiffs had not "put forth the necessary evidence to show that any actions taken by Officers Riser or Ferdinand caused Mr. Johnson's" death. The court granted the motion for judgment in favor of Officers Riser and Ferdinand on the battery count, finding that there was no evidence "that would support a battery as it relates to Officer

---

5. At the time of Mr. Johnson's death, Dondi Johnson, Jr. was 19 years old and De'Andre Johnson was 13 years old.

Riser and Officer Ferdinand." The court denied all other motions.

Counsel for Officers Ferdinand and Riser then called Dr. Gary Dennis, an expert in neurosurgery. After review of Mr. Johnson's medical records, Dr. Dennis opined that Mr. Johnson's injury was not one that could "be caused by carrying a patient," but rather, it was caused by a significant force. In Dr. Dennis's opinion, Officers Ferdinand and Riser did not exacerbate Mr. Johnson's injury when they carried him out of the van, stating that "carrying him didn't change the alignment of the spine because those bones were stuck in position and couldn't even be pried apart with weights."

After Officers Ferdinand and Riser rested their case, Officer Leake took the stand on her own behalf. She testified that she previously had transported prisoners who "had not been seatbelted," that none of them had been injured, and that she did not intend to injure Mr. Johnson.

At the close of all of the evidence, counsel for appellants renewed their motions for judgment. Significant to this appeal, they did not argue that they were entitled to judgment on the ground of public official immunity. The court denied the motions and submitted the case to the jury.

The jury returned verdicts against all three defendants. It found that Officers Ferdinand and Riser were negligent, but not grossly negligent, and their actions were a cause of injury to Mr. Johnson, but not a cause of death. It found that Officer Leake's actions were negligent and grossly negligent, but not committed with malice, and her actions were both a cause of injury to Mr. Johnson and a cause of death.

The jury awarded damages to the estate of Mr. Johnson in the amount of: (1) $87,000 for compensatory, economic damages; and (2) $5,000,050 for compensatory, non-economic damages, including pain and suffering. The jury awarded damages to both Dondi Johnson, Jr. and De'Andre Johnson, individually, in the amount of: (1) $34,000 for loss of financial support; and (2) $1,100,000 for non-economic damages.

Appellants subsequently filed motions for judgment notwithstanding the verdict, or in the alternative, motions to revise and reduce the judgment. They argued, *inter alia,* that they were protected from liability by common law public official immunity. Alternatively, they argued that, pursuant to the Local Government Tort Claims Act (the "LGTCA"), judgment should be entered against the Department, and the compensatory damages should be revised to the $200,000 limit on damages mandated by the LGTCA.

On May 28, 2010, appellees filed a Consolidated Response in Opposition to Defendants' Motions for Judgment Notwithstanding the Verdict or, Alternatively, Motion to Revise Judgment. They argued that the officers were "not entitled to public official immunity" because they were performing "ministerial acts." They further argued that "due to the special relationship between the prisoner and his officer custodian, public official immunity is inapplicable in this case as to all officers." With respect to the argument regarding the limit of liability pursuant to the LGTCA, they argued that there were three claims for each of two occurrences, permitting a cap of $1,000,000, not $200,000.

On June 24, 2010, the circuit court held a hearing on the motions. The parties reiterated their arguments. On December 22, 2010, the court issued an order denying the motions for judgment notwithstanding the verdict and granting the motions to revise the judgment.

With respect to the issue of public official immunity, the court noted that such immunity from liability is available only if the public official was performing a discretionary task at the time the negligent act occurred. The court found that the officers here were not entitled to public official immunity because the negligent conduct occurred while the officers were performing ministerial tasks, as a matter of law. With respect to Officers Ferdinand and Riser, the court noted that "the protocol for handling an injured arrestee directed Officers Ferdinand and Riser to 'not aggravate the injury.'" The court stated that, instead of following this mandate:

Officers Ferdinand and Riser lifted a person with back, neck, or other spinal injuries out of the paddy wagon and placed him in the rear of their patrol car seated. Once[ ] Mr. Johnson explained to the Officers that he was unable to move[,] emergency medical care should have been notified. Instead, the Officers lifted Mr. Johnson out of the patrol car a second time when they arrived to Sinai Hospital. This second decision violated the General Order when medical attention was never called to the scene. Therefore, Officer Ferdinand and Officer Riser were performing ministerial tasks and ignored the requirements resulting in negligence that caused the injury, thus they are denied public official immunity.

With respect to Officer Leake, the court noted that the operation of a motor vehicle constitutes a ministerial act, and it found "that Officer Leake's negligence and gross negligence occurred while conducting ministerial acts, as a matter of law." It found that Officer Leake drove the vehicle in a manner that injured Mr. Johnson, and the "manner in which she operated her vehicle and the routes she decided to take did not rise to the level of discretion required to elevate her acts into discretionary acts." The court also found that General Order K–14 "requires police officers to seatbelt the arrestee unless he or she poses a danger to the Officer," that there was no evidence that Mr. Johnson posed a danger, and that Officer Leake "offered no explanation or justification for violating" the Order.

The court then addressed the liability limits of the government pursuant to the LGTCA: "$200,000 per an individual claim" and "$500,000 per total claims arising from the same occurrence." The court found three individual claims involved here, stating:

[T]he facts surrounding Mr. Johnson's untimely death sets forth a claim for the Estate of Dondi Johnson Sr., a wrongful death claim for Mr. Johnson's eldest son Dondi Johnson Jr., and another wrongful death claim for Mr. Johnson's youngest son, De'Andre Johnson. The jury awarded each plaintiff a separate amount of damages for

separate causes of action, and each one of these claims can be separately enforced.

The court explained, however, that, although each individual claim was "capped at Two Hundred Thousand ($200,000), the maximum amount the local government must pay is a total of Five Hundred Thousand ($500,000) per occurrence." The court found one "occurrence" involved here, noting that "[a]ll of the events and acts were related to the moving or transportation of" Mr. Johnson and involved "one seamless and continuous series of negligent events."

The court revised the judgment as follows:

The Court revises the judgment from Seven Million Four Hundred and Five Thousand Dollars ($7,405,000) to a total of Six Hundred Fifty Thousand Dollars ($416,500).[6] Specifically, the award for the Estate of Dondi Johnson Sr. is capped at Two Hundred thousand dollars ($200,000); the award for Dondi Johnson Jr. is One Hundred Eight Thousand Two Hundred and Fifty Dollars ($108,250); and the award for De'Andre Johnson is One Hundred Eight Thousand Two Hundred and Fifty Dollars ($108,250).

Each of the parties noted a timely appeal.

## DISCUSSION

### I.

Appellants contend that the lower court erred in failing to grant their motion for JNOV on the ground that they were immune from liability. They argue that their actions, which

---

6. The court explained that: "$650,000. is the total award per occurrence ($500,000), with ten statutory $15,000 increases from 1995 until 2005 ($150,000)," an apparent reference to Md.Code (2006 Repl.Vol., 2010 Supp.) § 11–108(b)(2) of the Courts and Judicial Proceedings Article, which provides for a $500,000 limit on non-economic damages with that limit increasing by $15,000 each year beginning on October 1, 1995. The $500,000 limit in the LGTCA, however, does not have a similar provision allowing for increases. The court's subsequent use of $416,500 as the amount of the judgment is not explained. From our reading of the court's analysis, however, the judgment should have been revised to $500,000.

occurred in furtherance of their official duties, were discretionary, and therefore, they were entitled to public official immunity.

The doctrine of common law public official immunity provides that a person "will be relieved of liability for his *non-malicious* acts where: (1) he 'is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties.' " *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 137, 753 A.2d 41 (2000) (quoting *Ashburn v. Anne Arundel County,* 306 Md. 617, 622, 510 A.2d 1078 (1986)). Here, there is no dispute that the officers were "public officials" and that the acts complained of were part of their official duties. The sole issue is the nature of the acts they were performing.

With respect to the determination of whether actions are discretionary as opposed to ministerial, the Court of Appeals explained the term discretionary as follows:

"The term 'discretion' denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, 'discretion' is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience, and uncontrolled by the judgment or conscience of others."

*James v. Prince George's County,* 288 Md. 315, 326, 418 A.2d 1173 (1980) (quoting *Schneider v. Hawkins,* 179 Md. 21, 25, 16 A.2d 861 (1940). *Accord Houghton v. Forrest,* 412 Md. 578, 585, 989 A.2d 223 (2010). Ministerial acts, on the other hand, are " 'duties in respect to which nothing is left to discretion as distinguished from those where the official has the freedom and authority to make decisions and choices.' " *James,* 288 Md. at 326, 418 A.2d 1173 (quoting *State, use of Clark v. Ferling,* 220 Md. 109, 113, 151 A.2d 137 (1959)).

Appellees contend that "the circuit court correctly held that the officers were not entitled to public official immunity

because they were carrying out ministerial, non-discretionary tasks relating to the transport and care of an arrestee." They argue as a threshold matter, however, that appellants were not entitled to JNOV on the ground that "they waived the right to assert such a defense by failing to argue the immunity [issue] at the close of all the evidence or at any time prior to the verdict."

We begin with appellees' procedural argument. Maryland Rule 2–532(a), which governs motions for judgment notwithstanding the verdict, provides:

> (a) **When permitted.** In a jury trial, a party may move for judgment notwithstanding the verdict *only if* that party made a motion for judgment at the close of all the evidence and *only on the grounds advanced* in support of the earlier motion.

(Emphasis added).

In *General Motors Corp. v. Seay,* 388 Md. 341, 361, 879 A.2d 1049 (2005), the Court of Appeals made clear that the failure to make an argument in a motion for judgment at the close of the evidence results in the loss of the right to file a motion for JNOV. In that case, the defendants made a motion for judgment at the end of the plaintiff's case and at the end of their case. *Id.* at 348, 879 A.2d 1049. The trial court then allowed the plaintiff to present rebuttal testimony, and GM failed to renew the motion for judgment following that testimony. *Id.* at 350, 879 A.2d 1049. After the jury returned a verdict in favor of the plaintiff, GM filed a motion for judgment notwithstanding the verdict. *Id.* The Court of Appeals reversed the trial court's order granting the motion for JNOV, stating that a "motion for judgment must be made at the close of all the evidence before a motion for JNOV can be properly made and ruled on by the court." *Id.* at 352, 879 A.2d 1049.

The Court explained the rationale for the rule:

> The requirement that a party must renew the motion for judgment at the close of all the evidence serves two fundamental purposes. First, renewal of the motion "enables the trial court to examine the sufficiency of all the evidence

before submitting the question to the jury." *Petit v. City of Chicago*, 239 F.Supp.2d 761 (N.D.Ill.2002). And second, it "alerts the opposing party to any defect in its case, thereby affording it an opportunity to cure any such defect." *Id.* In *Szmaj v. American Tel. & Tel. Co.*, 291 F.3d 955, 958 (7th Cir.2002), the court pointed out that,

> if a motion for judgment as a matter of law is made at the close of plaintiff's case and denied and not renewed at the close of the defendant's case, the plaintiff may assume that the denial was the end of the matter, while if the defendant shows by renewing the motion that the denial was not the end of the matter, the plaintiff may ask and may receive permission from the judge to put in some additional evidence to show that there is a jury issue.

*Id.* at 358, 879 A.2d 1049.

■ Pursuant to *Seay* and Maryland Rule 2–532, the right to file a motion for JNOV is relinquished if the party failed to raise, in a motion for judgment at the close of all the evidence, the ground asserted in the motion for JNOV. Here, although the officers made motions for judgment at the close of the evidence, they did not raise the argument that they were entitled to public official immunity.[7] Therefore, pursuant to

---

7. At first glance, it appeared that Officer Leake did make such an argument, but a review of the entire argument on the motion for judgment shows that counsel did not argue public official immunity. Counsel initially stated that "Officer Leake asserts her public official immunity with respect to the negligence as discussed in *Houghton*," asserting that "she was engaged in discretionary contact that would protect her from liability under the negligence counts." After extended discussion regarding the scope and propriety of counsel's argument, however, counsel stated that he was not arguing that the negligence claim against Officer Leake should be dismissed, but rather, that any judgment on the negligence counts was "restricted to the confines of ... the waiver under the Local Tort Claims Act." Appellees' counsel confirmed that it was clear that Officer Leake's was not seeking to dismiss the negligence count, and the court agreed. The court then denied Officer Leake's motion "with regard to all of the counts that remain." A review of the entire argument shows that counsel was not seeking dismissal of the charges based on public official immunity, but rather, counsel was arguing, pursuant to *Houghton v. Forrest*, 412 Md. 578, 989 A.2d 223 (2010), that the Department was obligated to pay any

Rule 2–532(a), they relinquished the right to argue public official immunity in their motion for JNOV.

Appellants argue, however, that this Court should decline to consider appellees' argument of waiver because they did not raise this argument in the circuit court. They assert that it "is clear that the public official immunity issue was 'decided by the trial court' as to all three officers." (Quoting Md. Rule 8–131(a)). Therefore, they contend, the immunity issue may be decided on appeal.

This same argument was addressed in *Seay* where the plaintiff similarly failed to argue below that the defendant was precluded from making a motion for JNOV because it had not made a motion for judgment at the close of all the evidence. *Seay*, 388 Md. at 358, 879 A.2d 1049. In that case, the Court of Appeals began the analysis by referring to Maryland Rule 8–131(a), which provides that, ordinarily, an appellate court will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court." *Id.* at 362, 879 A.2d 1049. The Court noted, however, that " 'an appellate court has discretion to excuse a waiver or procedural default and to consider an issue even though it was not properly raised or preserved by a party.' " *Id.* (quoting *Jones v. State*, 379 Md. 704, 713, 843 A.2d 778 (2004)).

The Court stated that there are "two questions that an appellate court should ask itself when deciding whether to exercise its discretion: (1) whether the exercise of its discretion will work unfair prejudice to either of the parties; and (2) whether the exercise of its discretion will promote the orderly administration of justice." *Id.* at 363, 879 A.2d 1049 (footnotes omitted). Applying these factors, the Court of Appeals upheld this Court's exercise of discretion in deciding the unpreserved issue of whether the motion for JNOV was properly before the trial court. *Id.* at 364, 879 A.2d 1049. The Court explained:

---

award against Officer Leake pursuant to the LGTCA. At oral argument, counsel for both parties agreed with this assessment of the argument.

The question is purely a matter of rule interpretation and does not depend on the presentation of additional evidence. Moreover, had the procedural error been raised at the trial level, the proper result would have been to deny the motion irrespective of any efforts to correct the error. Simply put, the error is not correctable. GM was not, therefore, prejudiced by the exercise of discretion to address the unpreserved ground for objecting to GM's motion.

*Id.*

Similarly, we will exercise our discretion in this case to consider whether appellants' motions for JNOV were properly before the trial court. As indicated, because appellants did not raise the issue of public official immunity in their motions for judgment at the close of the evidence, they relinquished their right to raise that argument in their motions for JNOV. The trial court, therefore, properly denied the motion for JNOV.

## II.

The next issue involves the circuit court's order granting appellants' motions to reduce the jury's verdict pursuant to the LGTCA.[8] The court reduced the jury's verdict from $7,405,000 to $416,500.

There is no question that the LGTCA imposes limits on a local government's liability, or that the verdict in this case was required to be reduced. The question here is how those limits apply to the facts in this case, and thus, what is the appropriate amount of the reduction in the verdict.

The LGTCA provides, in relevant part, as follows:

[T]he liability of a local government may not exceed $ 200,-000 per an individual claim, and $ 500,000 per total claims

---

8. As indicated, the jury awarded damages to the Estate of Mr. Johnson of $87,000 in economic damages and $5,050,000 in non-economic damages, against all three officers. The jury also awarded wrongful death damages to Dondi Johnson, Jr. and De'Andre Johnson, individually, of $34,000, in economic damages for loss of financial support and $1,100,000, in non-economic damages.

that arise from the same occurrence for damages resulting from tortious acts or omissions, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

Md.Code (2006 Repl.Vol., 2010 Supp.) § 5–303 of the Courts and Judicial Proceedings Article ("C.J.P.").

The circuit court found that the case involved three individual claims, one involving the estate of Mr. Johnson and two involving the wrongful death claims of his two sons. The court further found that, although there were three claims with a statutory cap of $200,000 per individual claim, there was only one occurrence, resulting in a cap of $500,000. Each of the parties assert error in this ruling.

Appellants argue that there was only one claim in this case, and the court erred in finding that there were three claims. They argue that only Mr. Johnson was directly injured in the incident, and the claims by his sons for losses due to his wrongful death were derivative actions that, taken together with Mr. Johnson's survival claim, are subject to the individual claim limitation in the LGTCA. Thus, they argue, the circuit court should have reduced the total judgment against the three officers to $200,000.

Appellees argue that the circuit court properly found that there were three claims pursuant to the LGTCA, asserting that the injuries suffered by Mr. Johnson's two children were separate and distinct, and therefore, independent from the survivorship claim brought on behalf of the Estate of Mr. Johnson. Appellees argue, however, that the court "erred in determining that there was a single occurrence where the evidence established two separate and distinct causes of Mr. Johnson's injuries." They argue that, "after Officer Leake's negligent conduct concluded, Officers Ferdinand and Riser subsequently pulled Mr. Johnson from the van in such a way as to cause a separate, although related, injury resulting in total paralysis." Pursuant to appellees' argument that there were three claims and two occurrences involved, the proper judgment would have been $1,000,000.

The interpretation of the meaning of the LGTCA presents a question of statutory interpretation. As the Court of Appeals recently made clear, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18 (2010). In this regard, we apply well-settled rules:

> We begin the statutory interpretation process by looking to the plain language of a statute, giving the words their natural and ordinary meaning. *Breslin* [*v. Powell*], 421 Md. [266,] 286, 26 A.3d [878], 891 [ (2011) ] (citing *State Dep't of Assessments and Tax'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13, 702 A.2d 690, 696 (1997)). To determine the plain meaning of language, we consider the statutory scheme in which the particular provision or provisions appear. *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339, 1341 (1996) (citing *Kaczorowksi v. Mayor of Balt.*, 309 Md. 505, 514, 525 A.2d 628, 632 (1987)) ("[The meaning of the plain language] is controlled by the context in which it appears."). If the language is clear and unambiguous on its face, our inquiry ends. *Id.* (citing *Marriot Emps. Fed. Credit Union v. MVA*, 346 Md. 437, 445, 697 A.2d 455, 458 (1997)). If the language is ambiguous, we turn to indirect approaches in aid of ascertaining the intent of the Legislature. *Breslin*, 421 Md. at 287, 26 A.3d at 891 (citing *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998)) ("[C]ourts will look for other clues—e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute."). When interpreting an ambiguous statute, we must construe the law in such a way as to avoid illogical or nonsensical conclusions. *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302, 783 A.2d 667, 671 (2001) (citing *State v. Branter* [*Brantner* ], 360 Md. 314, 322, 758 A.2d 84, 88–89 (2000)).

*Michael T. Polek et ux. v. J.P. Morgan Chase Bank, N.A., et al.*, 424 Md. 333, 351, 36 A.3d 399 (2012).

The Court of Appeals recently addressed the LGTCA limitation of liability of a local government to "$200,000 per an individual claim" and "$500,000 per total claims that arise from the same occurrence." *Bd. of County Comm'rs v. Marcas, L.L.C.*, 415 Md. 676, 684, 4 A.3d 946 (2010). The Court noted that the terms "individual claim" and "same occurrence" are not defined in the statute. *Id.* The legislative history of the statute, however, shows that the limitation on liability was enacted " 'for the purpose of limiting the civil liability of local government.' " *Id.* at 686, 4 A.3d 946 (quoting S. Judicial Proceedings Comm., Summary of Com. Rep., S.B. 237, p. 3 (Md.1987)). The cap was instituted so that local governments could " 'predict exposure for both insurance and budgetary purposes.' " *Id.* at 686, 4 A.3d 946 (quoting Office of the Governor, Governor's Legislative Office, Briefing Paper H.B. 253/S.B. 237, 9–10). Because the LGTCA was enacted during a time when local governments were having difficulty purchasing insurance, the Court of Appeals concluded "that the General Assembly intended that courts would use the insurance industry's definitions of 'individual claim' and 'same occurrence' when applying C.J. § 5–303(a)." *Id.* at 687, 4 A.3d 946.

In addressing the meaning of the term "individual claim" in the LGTCA, the Court in *Marcas* looked to the definition of "claim" in Black's Law Dictionary, which is as follows:

> 1. The aggregate of operative facts giving rise to a right enforceable by a court.... 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional.... 3. A demand for money, property, or a legal remedy to which one asserts a right.... 4. An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; CAUSE OF ACTION....

*Id.* at 689, 4 A.3d 946 (quoting BLACK's LAW DICTIONARY 281–82 (9th ed.2009)). The Court further stated that "[c]laim is synonymous with 'cause of action,' " which is defined as: a "set of facts which would justify judgment for the plaintiff under some recognized legal theory of relief." *Id.* (quoting PAUL MARK SANDLER AND JAMES K. ARCHIBALD, PLEADING CAUSES OF

ACTION IN MARYLAND 2 (4th ed.2008)). With these definitions, the Court held that, when a local government's negligence in failing to comply with regulations pertaining to a landfill caused contamination to adjacent properties, "each adjacent property owner's claim for money damages would constitute an 'individual claim,' regardless of how many theories of recovery are asserted." *Id.* at 688, 4 A.3d 946.

Appellees argue that *Marcas* supports the trial court's finding that there are three claims here, asserting that the Court "made clear that each legally cognizable plaintiff may bring a separate 'claim' for purposes of calculating the 'cap' under the LGTCA." They note that wrongful death and survivorship actions address separate injuries, stating that a wrongful death action "is designed to compensate the family of a decedent who died," *Georgia–Pacific Corp. v. Benjamin,* 394 Md. 59, 79, 904 A.2d 511 (2006), and recoverable damages include the loss of the parent's advice, counsel, and training, C.J.P. § 3–904(d), whereas a survival action involves injury to the victim, and damages are determined based on the harm to the victim. *State v. Copes,* 175 Md.App. 351, 364, 927 A.2d 426 (2007). Thus, appellees argue, a wrongful death action presents claims "separate and distinct from those underlying a survivorship action," and the circuit court properly found three separate claims.

Appellants argue, however, that *Marcas* is not dispositive of the issue here because *Marcas* did not involve derivative claims. They assert: "Each adjacent owner's claim was for a direct injury; thus, it was a primary claim with no derivative claims and it was independent of each other owner's primary claim." Accordingly, appellants argue, *Marcas* "provides little guidance on this issue."

Appellants go on to argue, however, that the definition of "claim" given in *Marcas,* as synonymous with cause of action, a set of facts sufficient to justify a judgment in favor of the plaintiff, supports their argument that only one claim is involved in this case. They note that "both the survival claim and the wrongful death claims all arose from the same 'set of

facts'; the facts concerning the physical injury to" Mr. Johnson. Because the sons' wrongful death claims were derivative of the physical injury underlying the survival claim, appellants argue, the claims collectively were subject to the individual claim limitation, resulting in only one claim here.

We agree with appellants that *Marcas*, although helpful to the analysis of the issue here, is not dispositive. It does not answer the question presented in this case, *i.e.*, whether wrongful death claims are aggregated with a survivor claim, or considered separately, with respect to the LGTCA limitation of liability "per an individual claim."

In answer to that question, appellants contend that the Court of Appeals' opinions in *Daley v. United Services Automobile Association*, 312 Md. 550, 541 A.2d 632 (1988), and *Surratt v. Prince George's County*, 320 Md. 439, 578 A.2d 745 (1990), compel the conclusion that a wrongful death claim, a derivative action, is considered with the injured person's survival claim as a single claim. Appellees contend that appellants' reliance on these cases is misplaced.

In *Daley*, 312 Md. at 552, 541 A.2d 632, the Court of Appeals addressed liability pursuant to an insurance policy that limited liability for bodily injury to: (1) $100,000 for "each person" for damages "arising out of bodily injury sustained by one person as the result of any one occurrence"; and (2) $200,000 for "each occurrence" "arising out of bodily injury by two or more persons as the result of any one occurrence." The appellants were the parents of a minor child who was killed in an automobile accident, and they filed suit against the insured, raising wrongful death and survivor actions. *Id.* at 551, 541 A.2d 632. They obtained judgments of $75,000 on the survival claim and $75,000 for each parent on the wrongful death claims. *Id.*

The Court of Appeals held that the insurance policy limited recovery to $100,000 per person suffering bodily injury, that only the minor child suffered bodily injury within the meaning of the policy, and therefore, the $100,000 limit applied. *Id.* at 553, 560, 541 A.2d 632. The rationale was that, where a policy

fixes a maximum recovery for bodily injury to one person, the limit as to "each person" related to the person suffering bodily injury, not to persons suffering damages as a consequence of that injury. *Id.* at 553–54, 541 A.2d 632. Thus, the Court held that derivative or consequential damages are computed with the claim for bodily injury and subject to the "each person" liability limitation. *Id.* at 559, 541 A.2d 632.

As appellees note, *Daley* is distinguishable because it was based on the specific policy language involved in that case, which limited liability based on "bodily injury" to one person. The LGTCA, by contrast, does not use this language, but rather, it limits liability to "200,000 per an individual claim ... for damages resulting from tortious acts or omissions...." C.J.P. § 5–303(a)(1).

We cannot ignore, however, the Court of Appeals' repeated statements that, in construing limitations on local government tort liability, courts should look to definitions in the insurance industry. *See Marcas,* 415 Md. at 687, 4 A.3d 946; *Surratt,* 320 Md. at 452, 578 A.2d 745. The Maryland appellate courts have made clear that, in this State and other states, courts construe insurance policies with "each claim" or "per person" liability limits to include all claims for the injury to one person, including consequential damages and derivative damages to other persons as a result of the injury. *See Pac. Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 403 n. 3, 488 A.2d 486 (1985) (if "each claim" limit is in terms of bodily injury sustained by any one person, majority of cases apply "only one liability limit to the bodily injury of the child and the derivative claim of the parent combined"); *Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 696–98, 647 A.2d 1297 (1994) (citing numerous cases for the premise that consequential damages are subject to the same per person policy limits as the bodily injury claim and holding that $100,000 per person insurance policy limit applied to wrongful death claim by husband and sons of woman killed by negligent insured), *cert. denied,* 337 Md. 214, 652 A.2d 670 (1995).

In *Surratt,* 320 Md. at 452–53, 578 A.2d 745, the Court of Appeals incorporated these insurance concepts in a case involving a government liability cap. That case addressed claims raised by the parents of an infant who died at the age of 14 days due to obstetrical malpractice. The jury awarded damages for the survival and wrongful death claims in the amount of $533,739.86: (1) $33,739.86 for Ms. Surratt as personal representative of Baby Boy Surratt; (2) $350,000 for Ms. Surratt individually; and (3) $150,000 for the child's father. *Id.* at 451, 578 A.2d 745. The defendant, Prince George's County, argued, among other things, that any award must be reduced due to a provision in its charter limiting its liability in tort to $250,000 "per individual, per occurrence." *Id.* The plaintiffs argued that the $250,000 "per individual, per occurrence" limit entitled each of the three claimants to damages of up to $250,000, which would have resulted in a judgment of $433,739.86.[9]

In addressing the argument that a "per individual" limit would exceed the "per occurrence" limit, the Court stated that it was "not uncommon for a commercial liability policy to establish one limit of liability for each individual's claim and another larger one, for the entire 'occurrence,'" noting that was the approach taken by the LGTCA. *Id.* at 452–53, 578 A.2d 745. It found the language of the Prince George's County Charter, however, to be "a bit more cloudy." The Court ultimately held, though, that under the facts of the case, the damages were limited to $250,000. *Id.* at 453, 578 A.2d 745.

In explaining this decision, the Court discussed its opinion in *Daley,* in which, as indicated, the parents of a child killed

---

**9.** The opinion in *Surratt v. Prince George's County,* 320 Md. 439, 452, 578 A.2d 745 (1990), does not explicitly detail the petitioners' argument in this regard, but we have reviewed the brief that petitioners filed, and it clearly sets forth this argument. This Court is permitted to take judicial notice of pleadings filed in court. *See Snodgrass v. Stubbs,* 192 Md. 287, 292, 64 A.2d 130 (1949) ("no question, of course, that the Court of Appeals takes judicial notice of the records and all other papers properly filed in this Court").

similarly brought wrongful death and survival actions. *Id.* The Court noted its holding "that the only bodily injury was to the child and that the parents' (and the estate's) claims were derivative from that injury," and therefore, the " 'consequential or derivative damages [were] computed together with the claim for bodily injury of which they are a consequence.' " *Id.* (quoting *Daley,* 312 Md. at 554, 541 A.2d 632). The Court quoted from its opinion in *Daley* that "[w]here state law creates a right to damages for mental anguish suffered by those in specified relationships to the person who suffers bodily injury or death, it has been held that the damages for mental injury are, in effect, derivative of the single bodily injury." *Id.* (quoting *Daley,* 312 Md. at 554, 541 A.2d 632). The Court then concluded: "whether we view the death of Baby Boy Surratt as the occurrence, or whether we view him as the one person who was injured within the contemplation of Section 1013, the $250,000 limit applies." *Id.* at 454, 578 A.2d 745.

Appellants argue that the Court in *Surratt* "found that the parents' and estate's action presented only one claim, based on the injury to the child." They contend that, based on *Surratt,* "[c]laims for an injury that results from an injury to another person are derivative of the original injury and thus present a single claim under damages cap statutes."

Appellees argue, however, that *"Surratt* expressly refused to determine whether the $250,000 limitation applied because there was only one injured individual (the child), or whether it applied because all the injuries arose from a single occurrence," holding instead "that, in either event, the $250,000 cap would apply." In support of that argument, they cite the Court's statement that, "whether we view the death of Baby Boy Surratt as the occurrence, or whether we view him as the one person who was injured within the contemplation of § 1013, the $ 250,000 limit applies." *Id.* at 454, 578 A.2d 745.

We agree with appellants that *Surratt* did hold that the parents' wrongful death claims were derivative of the claim based on the injury to the child, and therefore, all three claims

presented a single claim under the "per individual" limit of liability. As indicated, the petitioners argued that there were three separate damage caps based on the three separate individuals asserting claims, permitting a judgment in the amount of $433,739.86. The Court declined to address whether the statute permitted individual claims to aggregate to an amount greater than $250,000 an occurrence. Rather, it found that the liability was capped at $250,000, either because the statute capped damages at $250,000 per occurrence or because there was only one individual claim. In so holding, the Court adopted the analysis in *Daley* that derivative damages are computed together with the claim for injury of which they are a consequence, despite the difference in language between the insurance policy involved in *Daley* and the County Charter in *Surratt*.

Thus, pursuant to *Surratt*, a "per individual" liability limit aggregates as one claim all causes of action based on the injury to one person, including the consequential or derivative claims of others resulting from the injury. This is consistent with the construction of insurance policies that "per person" policy limits include a bodily injury claim together with any derivative claim. *See Pacific Indem.*, 302 Md. at 403 n. 3, 488 A.2d 486; *Nationwide Mut. Ins. Co.*, 101 Md.App. at 696–98, 647 A.2d 1297.

We recognize that the LGTCA does not use this exact language; it does not limit liability "per person" or "per individual." Instead, it limits liability "per an individual claim."

There has been no suggestion that this difference in wording would change the analysis adopted in *Surratt*, that wrongful death claims, which are derivative of another person's claim of injury, are considered collectively as one individual claim. Indeed, in the other case that *Surratt* cited, *Chicago Insurance Co. v. Pacific Indemnity Co.*, 566 F.Supp. 954 (E.D.Pa.1982), *aff'd*, 720 F.2d 660 (3d Cir.1983), the medical malpractice insurance policy at issue involved a $100,000 limit for "each claim." In that case, the court stated that it was

clear "that derivative claims do not constitute separate claims for purposes of applying policy limitations or deductibles in automobile liability policies," and the court held that the limit for "each claim" was the number of patients injured, "not the number of persons adversely affected as a result of the patients' injury." *Id.* at 958–60.

■ Thus, pursuant to the analysis set forth in *Surratt,* a wrongful death claim will be aggregated with the claim of the injured person in applying the LGTCA limitation of liability of a local government to $200,000 per an "individual claim." [10] The circuit court erred in finding three individual claims in this case. The wrongful death claims here should have been aggregated with Mr. Johnson's survival claim, resulting in a judgment of $200,000.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT TO IMPOSE JUDGMENT IN THE AMOUNT OF $200,000. COSTS TO BE PAID 50% BY APPELLANTS AND 50% BY APPELLEES.**

---

10. We do note that the analysis adopted by *Surratt* is not universal, and other jurisdictions do allow wrongful death claims, or other derivative claims, to be considered as separate claims for purposes of a "per person" or "per claim" limitation on a government's liability. *See Gleason v. City of Oklahoma City,* 666 P.2d 786, 790 (Okla.App.1983) (where Tort Claims Act provided for limit of liability of $50,000 to any claimant for claims other than property damage, claims by widow and two children were separate claimants entitled to separate cap). *State v. Eaton,* 659 N.E.2d 232, 236–37 (Ind.Ct.App.1995) (where Tort Claims Act limited liability to $300,000 for injury to or death of one person, child's claim for injuries and parents' derivative claim for loss of services were two separate claims).