82 A.3d 1240

**Estela Jacome de ESPINA, et al.**

v.

**PRINCE GEORGE'S COUNTY, Maryland, et al.**

**No. 2044, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Dec. 20, 2013.

Reconsideration Denied Feb. 4, 2014.

612

614

Timothy F. Maloney (Veronica Byam Nannis, Levi S. Zaslow, Matthew M. Bryant, Joseph Greenwald & Laake, PA, Greenbelt, MD and Thomas C. Mooney, Upper Marlboro, MD), all on the brief, for appellant.

Victoria M. Shearer (Daniel Karp, Karpinski, Colaresi & Karp, PA, on the brief) Baltimore, MD, for appellee.

Panel: KEHOE, BERGER, IRMA S. RAKER (Retired, Specially Assigned), JJ.

BERGER, J.

This appeal involves litigation arising from the shooting death of Manuel Espina ("Espina") by off-duty Prince George's County police officer Steven Jackson ("Jackson"). The primary issue before us is the extent to which the Local Government Tort Claims Act (the "LGTCA") limits recovery for state constitutional violations.

Following Espina's death, Espina's wife, Estela Concepcion Jacome–Espina ("Estela"),[1] Espina's son, Manuel de Jesus Espina–Jacome ("Manuel"),[2] and Espina's estate (collectively, "the Espinas") filed suit against Jackson and Prince George's County ("the county") in the Circuit Court for Prince George's County. After a twenty-three day trial and three days of deliberation, the jury returned a verdict in favor of the Espinas, finding that Jackson violated Espina's rights under Article 24 of the Maryland Declaration of Rights, assaulted and battered Espina, wrongfully caused Espina's death, and violated Manuel's rights under Article 24 of the Maryland Declaration of Rights.[3] The jury found that Jackson acted with actual malice and did not act in self-defense, and awarded

---

1. In the case caption, record and briefs, Espina's wife's name is sometimes spelled "Estelan" and sometimes spelled "Estela." We shall use the spelling "Estela."

2. Manuel died on March 17, 2013. The suggestion of death and substitution with death certificate was filed on June 21, 2013. Estela is the personal representative of Manuel's estate.

3. Claims of negligent supervision, intentional infliction of emotional distress, false arrest, malicious prosecution, and battery of Manuel were all voluntarily dismissed during trial and prior to the verdict. Suit was also originally brought against defendants Gables Residential Services, Inc. and Officer Eric Freeman, both of whom were dismissed. The jury found that there was no assault against Manuel.

damages totaling $11,505,000.[4] Applying the Local Government Tort Claims Act ("LGTCA") damage cap, the circuit court reduced the $11,505,000 million verdict against Prince George's County to $405,000.[5] The original verdict against Jackson was not reduced. All parties noted timely appeals.

The Espinas present four issues for our review, which we have rephrased as three issues as follows:

1. Whether the LGTCA damages cap applies to the constitutional claims.

2. Whether the LGTCA damages cap is unconstitutional as applied to the state constitutional claims.

3. Whether the circuit court erred in applying the LGTCA damages cap to reduce the judgment against Prince George's County from $11,505,000 to $405,000.

The county and Jackson present nine issues for our review, which we have rephrased as follows:

1. Whether the circuit court erred in denying the motion to dismiss the unlawful pattern and practice claim.

2. Whether, if the LGTCA damages cap does not apply, the general damages cap found in § 11–108 of the Courts and Judicial Proceedings Article should be applied.

3. Whether the circuit court erred by excluding evidence regarding Espina's immigration status and pocket knife.

---

**4.** The jury awarded noneconomic damages in the amount of $5,000,000 for the violation of Espina's constitutional rights, economic damages in the amount of $5,000 for the violation of Espina's constitutional rights, noneconomic damages in the amount of $5,000,000 for Espina's wrongful death (to be divided 95% to Estela and 5% to Manuel), and noneconomic damages in the amount of $1,500,000 for violation of Manuel's constitutional rights.

**5.** The circuit court originally reduced the verdict against Prince George's County to $805,000 pursuant to the LGTCA cap. Following this Court's decision in *Leake v. Johnson,* 204 Md.App. 387, 40 A.3d 1127 (2012), the county filed a motion for reconsideration. After a hearing, the circuit court ordered that the verdict against Prince George's County be reduced to $405,000.

4. Whether the circuit court erred by admitting evidence of Jackson's involvement in two previous stops of two other individuals.

5. Whether the Article 24 claim should be vacated because the claims of excessive force should have been asserted as an Article 26 claim.

6. Whether there was sufficient evidence to establish malice.

7. Whether the jury's verdict with respect to Manuel's claims is irreconcilably inconsistent.

8. Whether the verdict sheet was incorrect as a matter of law.

9. Whether the damages awarded by the jury were plainly excessive.

For the reasons set forth below, we shall affirm in part and reverse in part the judgment of the Circuit Court for Prince George's County.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 16, 2008, Espina and a friend were enjoying a beer outside Espina's Langley Park apartment. Prince George's County police officer Steven Jackson drove by Espina and his friend and observed the men drinking what he believed to be alcoholic beverages in the common area of the apartment complex.[6] Jackson was driving his marked police cruiser and was wearing his Prince George's County police uniform.[7] Jackson worked secondary employment as a security guard at the apartment complex. After driving past the men twice in hopes that the men would disperse after seeing the police cruiser, Jackson parked his cruiser and approached

---

6. The jury was instructed that Espina did not violate the law regarding the use of alcohol by drinking an alcoholic beverage outside his apartment building.

7. The parties stipulated that throughout the incident, Jackson was working within the scope of his employment as a county police officer and exercised his police powers.

the area where Espina and his friend had been standing. After Espina and his friend had entered the building, Jackson used his master key to enter the locked building. Inside the building, a confrontation ensued between Jackson and Espina. The details of the confrontation were significantly disputed at trial. We first describe the version of events as presented by Jackson. Thereafter, we describe the incident as testified to by the other witnesses.

*A. Jackson's version of events.*

Jackson testified that he entered the building to investigate possible violations of loitering, trespassing, or open container laws. When he entered the building, Jackson believed that Espina and another man had "taken evasive movements or measures" by going into the building and Jackson felt "outnumbered." Jackson testified that he asked Espina if he had any weapons and to put his hands against the wall. Jackson placed his hands on Espina and then, according to Jackson, Espina elbowed him in the back of his neck. Jackson testified that Espina became anxious and took a combative stance, and that after Espina charged him, Jackson sprayed Espina in the eyes with pepper spray. Jackson explained that he was able to get one handcuff on Espina's left hand but was unable to finish handcuffing him due to Espina's resistance. Jackson testified that he viewed the loose handcuff on Espina's left hand as a deadly weapon.

At some point, Jackson and Espina moved down the stairs to the first floor landing. Jackson testified that as Espina and he were pushing each other, they lost their balance and both fell down the stairs. Jackson further explained that Espina landed face-first on the floor; Jackson landed on top of Espina. Jackson acknowledged that Espina was noticeably bleeding from his face. Jackson testified that he allowed Espina to push himself up. After Espina got up, he charged at Jackson and Jackson began to strike Espina with his baton. According to Jackson, the baton strikes were ineffective, so Jackson placed Espina in an arm lock. Jackson testified that Espina walked with him toward the front door of the building

and the struggle continued with pushing and shoving near the mailboxes. While near the front door, Jackson called for backup over his police radio.

Jackson testified that after he finished his call to dispatch, Espina began running downstairs to the lower level. Jackson explained that he grabbed Espina by the shirt and struck him with his baton because he was concerned that Espina might be trying to break into one of the lower level apartments. Espina and Jackson continued fighting into the lower level apartment of Espina's friends, Maria Gamez ("Gamez") and her daughter, Elvia Rivera ("Rivera").[8] Jackson believed that Espina had forced the apartment door open with the weight of his body. Jackson testified that Espina fell face-first onto the hard floor of Gamez's apartment, but then Espina rolled onto his back and engaged in defensive kicking. Jackson testified that, at that point, he began hitting Espina with his baton with "as much force as [he] could." Jackson further testified that while he was striking Espina, he felt a blunt force from behind him that caused him to fall onto the couch. Jackson did not see who had struck him. Jackson testified that after he got up from the couch, four to five unidentified men came into the apartment, but he did not know where the men came from; they did not appear to have entered through the door. Espina and one other man attempted to grab the baton from his hand. Jackson and the two men engaged in a struggle for the baton.

Thereafter, according to Jackson, the other men engaged in the struggle and a total of five to seven people pushed at him and grabbed for the baton. Jackson testified that the men were pushing him toward the couch and reaching near his waistband and holster. Jackson testified that he begged the people to stop pushing against him, but they continued to push. According to Jackson, Espina reached toward his service weapon and Jackson feared that he might lose his weapon. Jackson removed his weapon from his belt and pointed the gun at the group of people. Jackson testified that, while

---

**8.** In the record and briefs, Ms. Rivera's name is sometimes spelled "Elvia" and sometimes spelled "Elvira."

he was holding the gun at waist level pointing toward the group of men, he asked everyone to get back and warned that he would shoot, but the members of the group continued reaching for his baton and service weapon. Espina was on his feet and moved toward Jackson, with his hands on Jackson's baton. Espina removed his hands from the baton and Jackson believed that Espina was going to take his service weapon. Jackson testified that, in fear for his life, he leaned his upper body backwards and fired his service weapon, striking Espina in the stomach. Jackson testified that Espina was standing when the fatal shot was fired and remained standing immediately after he was shot.

Jackson testified that after the shooting, the group retreated enough so that he was able to leave the apartment. Jackson attempted to put his foot in the door to keep the door open, but someone inside the apartment pushed the door closed. Jackson went outside of the apartment building and radioed that shots had been fired. Additional backup arrived shortly after the call. Jackson testified that he walked into the apartment with one of the arriving officers. At least two other officers arrived as well, although Jackson could not remember exactly when they arrived. The officers observed a man, who later was identified as Manuel, performing CPR on Espina, who was lying on the floor. Jackson testified that he had no recollection of seeing Estela in the apartment after he returned with the other officers, nor did he see the group of men present in the apartment. Jackson asked one of the other officers to arrest Manuel (who was still performing CPR on his father) because he was involved in the previous alleged attack against Jackson. Jackson testified that he planned to resume CPR after Manuel was handcuffed, but the paramedics arrived and began performing CPR on Espina. Manuel was handcuffed and removed from the apartment; he was later charged with second degree assault, second degree assault on a law enforcement officer, and obstruction and hindering. The criminal charges against Manuel were later dismissed.

Jackson testified that he used deadly force because he believed that his life was in danger. Jackson explained that he feared for his life because the group of men had a strategic advantage over him by virtue of their number and position. Jackson denied that he yelled profanity at any time during the altercation.

*B. The incident as testified to by other witnesses.*

Noe Cordova ("Cordova"), a friend of the Espina family, testified that on the afternoon of August 16, 2008, he was outside of the apartment building with Espina, Estela, Manuel, and Gamez. It was Espina's birthday and Gamez was planning a birthday meal for him in her apartment. After the individuals went into the apartment building, Espina told Cordova that he thought he saw a police officer outside. Espina walked up to the landing and a police officer, who was later identified as Jackson, entered through the door and quickly walked past Cordova. Cordova testified that Jackson had a furious expression on his face and uttered the phrase "mother fucker." According to Cordova, Jackson grabbed Espina, pushed him against the wall, and hit him in the face. Jackson then sprayed Espina with pepper spray. Cordova testified that Espina began to yell, but Jackson kept hitting him and then threw Espina down the stairs. Cordova observed that Espina's face was bleeding and that Jackson continued to strike Espina with the baton. After Espina and Jackson moved to the lower level, Cordova was unable to see the altercation, but Cordova testified that he heard Espina's screams and heard a shot from Gamez's apartment. Cordova saw Jackson come out of the apartment after the shot was fired. He testified that he did not see anyone else come out of the apartment.

Luis Felipe Agustín ("Agustín"), another friend of the Espinas and resident of the apartment complex, testified that he saw a police cruiser parked outside of the apartment when he arrived home from work on the afternoon of August 16, 2008. When he walked up to the door of the apartment, Agustín saw Espina pushed up against the glass door at the entrance to the

building. Agustín testified that Espina, whose face was "bathed in blood," was trying to exit through the door and the officer, who was later identified as Jackson, was striking him with his hands. Agustín testified that Jackson pushed Espina down the stairs to the lower level of the apartment building. Once Jackson and Espina moved to the lower level of the building, Agustín was no longer able to see the altercation. Thereafter, Agustín saw Manuel running out from the adjacent building where he lived. Agustín told Manuel that he needed to see what was going on with his father and the officer. Agustín observed Manuel enter the lower level apartment, where Jackson and Espina continued to struggle, through the kitchen window. Agustín testified that he heard a gunshot approximately ten seconds after Manuel entered the apartment. Agustín then saw Jackson running out of the apartment before other officers began to arrive. Agustín did not see any other men or any other people run out of the apartment building. Agustín testified that did not see Espina hit, kick, or strike Jackson at any point in time.

Elvia Rivera ("Rivera"), a friend of the Espina family, testified that as of August 16, 2008, she lived with her mother, Gamez, in the lower level apartment. Rivera testified that Gamez was preparing a meal for Espina's birthday celebration. Rivera looked through the peephole in her apartment door and observed an officer, who was later identified as Jackson, beating Espina with a baton. The struggle was occurring on the landing near the front door of the apartment building. She described Espina as "very hurt and bloody." According to Rivera, Espina did not resist or fight back and was not hitting or kicking Jackson in any way. Rivera testified that she unlocked and opened her apartment door because she saw her friend getting hurt. Immediately after she opened the door, Rivera saw Espina and Jackson coming down the stairs. Rivera described Espina as "rolling on his back" with Jackson "beating him behind him." Rivera testified that Jackson was yelling the word "fuck" and using a mean and angry tone of voice. She testified that she heard Jackson using the word "fuck" many times.

After Rivera opened the door to the apartment, Jackson and Espina stumbled into her apartment. Rivera testified that Jackson continued to strike Espina, who at this point was "crouched down on the floor, pretty much on his knees." Jackson remained standing. Rivera testified that she heard Espina "moaning a lot." Rivera saw Jackson hitting Espina with the baton, saying "[f]uck, shut the fuck up" in a very mean voice. Rivera testified that she was afraid, so she grabbed Gamez and took her to the bedroom, where Gamez's boyfriend Carlos was also present. After she got her mother into the bedroom, Rivera came back out into the living room and saw Jackson shoot Espina in the stomach. Rivera testified that Jackson was standing when the shot was fired and that Espina was crouched on the floor. Rivera testified that after Jackson shot Espina, she heard Jackson say "fuck" again.

Rivera testified that she did not see Espina touch Jackson's gun or waistband, and that there was not a group of five or six men surrounding Jackson before he shot Espina. Rivera testified that she did not see any other men in the apartment before Espina was shot, other than Carlos, who remained in the bedroom. According to Rivera, Manuel came into the apartment at some point and yelled to Jackson, "Why did you kill my father?" Rivera did not remember exactly when Manuel came into the apartment, but she testified that she did not see Manuel "doing anything against [Jackson]." She testified that she did not see Manuel doing anything with Jackson's baton or gun, nor did Rivera see Jackson fall or be pushed onto a couch.

After Espina was shot, Jackson ran out of the apartment. Rivera testified that Estela came into the apartment and was "screaming, crying, yelling, 'Why,' you know, 'There's a God and he's up there and he's seen this, and why did you kill my husband?'" Rivera testified that Jackson responded to Estela, saying, "shut the fuck up." She also heard Jackson say "fuck" or "fuck you" using a very angry tone of voice. Rivera called 9–1–1; a recording of her 9–1–1 call was played for the jury and entered into evidence. Rivera identified her own voice on

the tape. She also identified a voice on the tape as Jackson's. In the recording, the voice Rivera identified as Jackson's was heard saying, "shut the fuck up" and "fuck you." Rivera identified the voice of Estela, which was heard on the tape screaming in the background. Rivera testified that during the time of the 9–1–1 call, Espina was gagging and looked like he was dying. No one was struggling with the officer. Rivera testified that she was told by the police to leave the apartment; she left and cooperated with officers outside.

Manuel, Espina's son, testified that on August 16, 2008, as he came out of his apartment, a neighbor alerted him that a police officer was beating his father. Manuel testified that he ran to the next-door apartment building in his complex and looked through the glass door; he observed the officer he identified as Jackson "hitting [his] father really hard." Manuel tried to open the door, but it was locked. He testified that, at this point, Espina was limping and bleeding significantly from his face. Initially, Manuel observed Jackson striking Espina with his fists, and later, striking Espina with his baton. Manuel testified that he saw Jackson use the baton to strike Espina's face, back, and leg. Manuel testified that Espina did not fight back. According to Manuel, Jackson struck Espina in the back with the baton, causing him to fall down the stairs to the lower level. Manuel testified that Jackson "continued hitting him until he got to the basement door." In order to get into the apartment where Espina and Jackson continued to struggle, Manuel entered through a kitchen window.

Manuel testified that when he got into the apartment, he yelled at Jackson to stop hitting Espina. Jackson continued to strike Espina, who was on his feet but was bent over. Manuel explained that Jackson repeatedly knocked Espina over and Espina tried to get up, only to be knocked down again. Manuel testified that he did not see Espina roll onto his back and kick Jackson. Jackson repeatedly said "fuck" as he struck Espina. Espina's face was bleeding and his eyes were filling with blood. From Manuel's perspective, Jackson was the only person who had control in the altercation. Manuel testified that the only people in the apartment were

Espina, Jackson, Gamez, Rivera, and himself and that there was no group of five to six men.

Manuel denied that he ever pushed Jackson onto the couch, as Jackson testified. Manuel further testified that he never put his hands on Jackson in any way. Prior to the gunshot, Manuel did not hear Jackson say "please stop" or "please let me go." Rather, Manuel testified that "[t]he only thing that [Jackson] was saying is 'fuck.'" Manuel did not hear Jackson say, "Get back, or I will shoot." Manuel testified that he saw Jackson shoot Espina and Espina screamed and fell to the floor. After Espina was shot, Manuel started crying and asked Jackson to call an ambulance. Manuel testified that Jackson responded by saying "shut up, shut the fuck up." Manuel attempted to perform CPR on Espina, while Jackson stood by the door and did not render assistance. While Manuel was attempting to perform CPR, another officer came up behind Manuel, arrested him, and removed him from the apartment. Manuel did not see a police officer take over CPR after his arrest. When Espina was brought out of the apartment by the paramedics, Manuel was not permitted to see Espina. Manuel testified that after his arrest, he was taken to the police station and shackled to a wall for four and a half to five hours. He was questioned and charged with assault on a police officer. Manuel testified that he was taken to jail and released after two days.

Estela, Espina's wife, testified that she arrived at Gamez's apartment after Espina had been shot. Manuel told Estela that an officer had beaten and shot Espina. Estela testified that there was not a group of four to six men inside the apartment and that she did not see any men leaving the apartment. Estela testified that she asked Jackson why he killed her husband and he responded using offensive language. Estela saw Manuel attempt to perform CPR on Espina. Estela explained that Espina was on the floor, was "losing a lot of blood," and "had [his] eye blown up, like it was puffed out." Estela testified that two officers grabbed her and removed her from the apartment. Estela asked to go with Espina, but the officers did not allow Estela to join her

husband in the ambulance. Estela identified her own voice as well as Jackson's voice in the 9–1–1 recording. The voice Estela identified as Jackson's was heard saying "shut the fuck up" and "fuck you."

The jury ultimately returned a verdict for the Espinas, finding Jackson and Prince George's County liable for the violation of Espina's rights under Article 24 of the Maryland Declaration of Rights, assault and battery of Espina, and wrongful death. The jury further found a violation of Manuel's rights under Article 24 of the Maryland Declaration of Rights, and awarded damages totaling $11,505,000. Jackson and the county filed a motion for remittitur, JNOV, and/or a new trial. After briefing and a hearing on the post-trial motions, the circuit court denied the motion for JNOV and the motion for a new trial, but granted the motion for remittitur by applying the LGTCA cap to the judgment and reducing the judgment as to the county to $805,000. Following this Court's decision in *Leake v. Johnson, supra,* 204 Md.App. 387, 40 A.3d 1127 the county filed a motion for reconsideration. After a hearing, the circuit court reduced the verdict as to Prince George's County to $405,000. The entire verdict as to Jackson was not reduced. The county also filed a motion to dismiss the "unlawful pattern or practice" claim against Prince George's County, which was the only remaining claim. The circuit court denied the motion to dismiss.

Additional facts will be discussed as necessitated by the issues presented.

## DISCUSSION

### I. State Constitutional Torts and the LGTCA Damages Cap

The applicability and constitutionality of the LGTCA damages cap, as applied to constitutional claims, is an issue that has been presented several times but never addressed by this Court or the Court of Appeals. In this case, however, we are presented squarely with the issue of the constitutionality of the LGTCA damages cap and are asked to decide the extent

to which the LGTCA limits recovery for state constitutional violations.

The damages cap provision of the LGTCA appears in § 5–303 of the Courts and Judicial Proceedings Article, which provides in relevant part:

(a)(1) Subject to paragraph (2) of this subsection, the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

(2) The limits on liability provided under paragraph (1) of this subsection do not include interest accrued on a judgment.

(b)(1) Except as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

Md.Code (1974, 2013 Repl.Vol.), § 5–303 of the Courts & Judicial Proceedings Article ("CJP").[9] The County[10] urges us to conclude that the LGTCA damages cap applies to the damages award in the instant case. The Espinas, on the other hand, assert that the LGTCA cap does not apply to damages awarded for state constitutional claims, and alternatively, if the cap does apply, it constitutes an unconstitutional abridgment of Article 19 of the Maryland Declaration of Rights and an unconstitutional violation of the separation of powers doctrine.

---

**9.** Unless otherwise indicated, all statutory references are to relevant sections and subsections of the Courts & Judicial Proceedings Article of the Annotated Code of Maryland.

**10.** "The County" refers to both Prince George's County and Officer Steven Jackson.

## A. The LGTCA damages cap's applicability to constitutional claims.

In considering the applicability of the LGTCA cap to claims involving constitutional violations, we look first to the statute itself. It is well established that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18 (2010). The Court of Appeals explained:

> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

> Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic

and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Id.* at 274–76, 987 A.2d 18 (internal quotations and citations omitted).

Accordingly, we look first to the text of the statute, which provides that the cap applies "for damages resulting from tortious acts or omissions." CJP § 5–303(a)(1). The statute further provides that the "local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." CJP § 5–303(b)(1). The statute, however, does not define the term "tortious acts or omissions."

The Court of Appeals' discussion of the Maryland Torts Claim Act ("MTCA") in *Lee v. Cline*, 384 Md. 245, 863 A.2d 297 (2004), while not directly on point, is instructive. In Lee, the Court of Appeals considered whether the MTCA provided qualified immunity to state personnel for tort actions based upon violations of the Maryland Constitution and certain common law intentional torts. The MTCA provided, in pertinent part, that state personnel enjoyed immunity "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." CJP § 5–222(b). The Court discussed the language of the MTCA as follows:

The current language of the Maryland Tort Claims Act plainly appears to cover intentional torts *and constitutional torts* as long as they were committed within the scope of state employment and without malice or gross negligence. There are no exceptions in the statute for intentional torts or torts based upon violations of the Maryland Constitution.

> This Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exceptions in the statutory language. *See, e.g., O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004) ("When interpreting a statute, we assign the words their ordinary and natural meaning. We will not ... 'judicially insert language to impose exceptions, limitations or restrictions not set forth by the legislature' ")[.]

*Lee,* 384 Md. at 256–57, 863 A.2d 297 (emphasis added). The Court concluded that "the immunity under the Maryland Tort Claims Act, if otherwise applicable, encompasses constitutional torts and intentional torts." *Id.* at 266, 863 A.2d 297. Similarly, the language of the LGTCA provides no exceptions for intentional torts or constitutional violations. As such, we are similarly reluctant to recognize an exception in a statute when there is no express basis for the exception in the statutory language.

We addressed the issue of the definition of "tort" in *Green v. N.B.S., Inc.,* 180 Md.App. 639, 952 A.2d 364 (2008), *aff'd* 409 Md. 528, 976 A.2d 279 (2009). In *Green,* we considered whether the statutory cap on noneconomic damages applied to claims based upon violations of the Consumer Protection Act ("CPA"). In reaching our conclusion that the cap applies to violations of the CPA, we noted that "[i]n *Lee,* the Court interpreted the term 'tortious act or omission' to include causes of action to recover for constitutional torts. 384 Md. at 266, 863 A.2d 297. This is important for our purposes because a constitutional tort is obviously not a 'common law' tort." 180 Md.App. at 647, 952 A.2d 364 (internal citation omitted). The Court of Appeals affirmed, holding that "the cap statute applied to appellant's claim for damages that arose, in part, out of a violation of the CPA." 409 Md. at 544, 976 A.2d 279 (quoting 180 Md.App. at 659–60, 952 A.2d 364). *Green,* therefore, provides further support for a conclusion that the term "tort" includes not only "common law" torts, but civil wrongs based upon statutory violations and constitutional violations as well.

We have, however, acknowledged an "uneasy fit" between state constitutional torts and the requirements of the LGTCA. *Prince George's County, et al. v. Longtin,* 190 Md.App. 97, 115, 988 A.2d 20 (2010) (*"Longtin I "*), *aff'd,* 419 Md. 450, 19 A.3d 859 (2011) (*"Longtin II "*). We explained:

> The Court of Appeals has consistently said that the LGTCA and the Maryland Tort Claims Act (MTCA) do not exclude State constitutional torts from their coverage. Less clear is whether the restrictions of those statutes that would defeat all or partial recovery apply in every respect to State constitutional torts.
>
> On the one hand, the Court of Appeals has said that a State constitutional tort, such as one premised on a violation of a "self-executing" constitutional provision, like Article 24 of the Maryland Declaration of Rights, is enforceable in a common law action for damages. In addition, State constitutional tort action cannot be defeated by the assertion of official or local government immunity. Thus, it appears to exist independently of the LGTCA, which is premised on a waiver of governmental immunity.
>
> On the other hand, at least in MTCA cases, the Court of Appeals has indicated that recovery against the State is available as long as the claimant complies with procedural requirements of the Act.

*Longtin I, supra,* 190 Md.App. at 117–19, 988 A.2d 20 (cited with approval in *Longtin II,* 419 Md. at 470, 19 A.3d 859). We also observed that "when it comes to State constitutional torts, there can be no easy reliance on a literal reading of either the MTCA or the LGTCA." *Id.* at 118 n. 26, 988 A.2d 20. Accordingly, despite the apparently unambiguous language of the LGTCA damages cap, we look beyond a mere literal reading of the statute.

We find guidance in Judge Harrell's concurring and dissenting opinion in *Longtin II,* 419 Md. at 500–23, 19 A.3d 859 (Harrell, J., concurring in part and dissenting in part).[11]

---

11. The majority did not reach the substantive issue of whether the LGTCA damages cap applied to constitutional claims because it con-

Judge Harrell noted that he would conclude that the LGTCA damages cap limits recovery for constitutional claims. Judge Harrell explained:

At common law (that is, before the LGTCA), a plaintiff could bring a constitutional tort claim directly against local government officers and employees, as well as their employers—the local governments. After the passage of the LGTCA, a plaintiff lost, however, his/her/its ability to recover from the officers and employees, provided those tortfeasors acted within the scope of employment. *The LGTCA restriction on liability ultimately applies to constitutional and non-constitutional tort claims alike, such that a plaintiff bringing a constitutional claim may recover only from the employing-local government.* See DiPino v. Davis, 354 Md. 18, 52 [729 A.2d 354] (1999) ("[L]ocal governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment."); *Ashton* [*v. Brown* ], 339 Md. [70], 108 n. 19, 660 A.2d [447], 465 n. 19 [ (1995) ] ("[T]here is no exception in the [LGTCA] for constitutional torts.... [T]he local government is required to pay the judgment against the employee ...."); *see also Lee v. Cline,* 384 Md. 245, 256, 863 A.2d 297, 304 (2004) (holding that the Maryland Tort Claims Act applies to constitutional and non-constitutional torts, such that the State steps into the shoes of public officials for purposes of liability).

*Id.* at 520–21, 19 A.3d 859 (emphasis added). Judge Harrell further referenced the Court of Appeals holding in *Green, supra,* 409 Md. 528, 976 A.2d 279, that the cap on noneconomic damages in CJP § 11–108 applies to constitutional claims as well as common law tort claims. *Longtin II, supra,* 419 Md. at 522, 19 A.3d 859 (Harrell, J., concurring and dissenting).

———

cluded that Longtin had a vested right in complete recovery for constitutional violations prior to the General Assembly's passage of revisions to the LGTCA in 2001. The Court concluded that the damage cap could not apply retroactively to limit Longtin's recovery.

We agree that a broad definition of the term tortious acts or omissions is appropriate. We find further support for this conclusion in *Ashton v. Brown*, 339 Md. 70, 660 A.2d 447 (1995). In *Ashton*, neither party raised the issue of the LGTCA, but the Court expressed its opinion on the applicability of the LGTCA in dicta, noting that "there is no exception in the Local Government Tort Claims Act for constitutional torts. In fact, there is no exception in the statutory language for any category of torts." *Id.* at 108 n. 19, 660 A.2d 447.

Moreover, nothing in the legislative history suggests that the General Assembly intended to limit the application of the cap to nonconstitutional claims. The General Assembly enacted the LGTCA, effective July 1, 1987. Acts of 1987, ch. 594. The LGTCA "affected the tort liability of local governments in several ways." *Mitchell v. Housing Authority of Baltimore City*, 200 Md.App. 176, 189, 26 A.3d 1012 (2011) (internal quotation omitted). In reviewing the legislative history of the LGTCA, we explained that the LGTCA "repealed prior legislation that had placed monetary caps on waivers of governmental immunity by charter counties and had imposed notice requirements for certain claims against counties or municipalities; defined local governments; adopted damages caps in tort actions; and imposed notice requirements that were 'essentially the same notice requirements which had existed under the prior law which was repealed' by the legislation enacting the LGTCA." *Id.*

In *Housing Authority of Baltimore City v. Bennett*, 359 Md. 356, 754 A.2d 367 (2000), the Court of Appeals addressed whether the LGTCA's damages cap limits a local government's liability in a lead paint action in which the government itself is a defendant, rather than an action in which the local government is liable for judgments against its employees. At that time, § 5–303(a) provided that "the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, *including* liability arising under subsection (b) of this section

and indemnification under subsection (c) of this section." [12] Md.Code (1998 Repl.Vol.), § 5–303(a) of the Courts and Judicial Proceedings Article. The Court of Appeals, focusing on the word "including," held that the LGTCA damages cap did not apply "to tort actions directly against local governments when the bases for such actions are enactments of the General Assembly, state common law, the state constitution, or federal law." *Bennett, supra,* 359 Md. at 373–74, 754 A.2d 367.

Immediately after the Court of Appeals issued its opinion in *Bennett,* the General Assembly enacted emergency legislation, eliminating the word "including" from CJP § 5–303(a) and replacing it with the word "or." Ch. 286, Acts of 2001 (effective April 20, 2001). In our opinion in *Longtin I, supra,* 190 Md.App. 97, 988 A.2d 20, we summarized the legislative action after *Bennett* as follows:

> In direct response to the *Bennett* decision, the General Assembly in 2001 passed emergency legislation, which, according to its title, was intended to "[clarify] that the monetary limits on the liability of a local government under the [LGTCA] apply to claims against local governments when named as defendants [and] that the monetary limits under the [LGTCA] apply to tort judgments for which local governments are liable...." Ch. 286, Laws of 2001 (HB 942). The legislation, which took effect upon the Governor's signature on April 20, 2001, reenacted without change C & JP § 5–303, but provided in an uncodified Section 2:
>
>> That it is the intent of the General Assembly that the total liability of a local government, directly or otherwise, in an action arising from tortious acts or omissions, may not exceed the limits on liability stated in § 5–303(a) of the Courts and Judicial Proceedings Article.

---

**12.** Subsection (b) provided then, as it does now, that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment" and "[a] local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection." CJP § 5–303(b). Subsection (c) pertains to punitive damages.

Finally, in an uncodified Section 3, the measure stated:

> That this Act shall apply to any claim for damages under § 5–303 of the Courts and Judicial Proceedings Article in a case pending on the effective date of this Act and arising from events occurring on or after July 1, 1987.

190 Md.App. at 126, 988 A.2d 20. We acknowledged in *Longtin I* that the legislative action "made no direct reference to constitutional torts," *id.*, but the uncodified sections indicate that the legislature intended to limit the total liability of a local government in a broad range of cases, with no exceptions for constitutional violations.[13]

Furthermore, we find prior applications of the notice requirement to state constitutional claims instructive. To be sure, "no Maryland appellate court has expressly held that the LGTCA notice requirement applies to state constitutional torts. . . ." *Rounds v. Maryland Nat. Capital Park & Planning Comm'n*, 214 Md.App. 90, 101, 75 A.3d 987 (2013).[14] We explained further:

---

**13.** The Espinas point to *Bennett, supra,* in support of their assertion that, as a matter of statutory construction, the damages cap cannot apply to claims involving constitutional violations. In *Bennett, supra,* in reaching its conclusion that the damages cap was inapplicable to a tort judgment directly against the Housing Authority, the Court of Appeals noted that "[i]t would not be a reasonable construction of the statutory language . . . to apply the monetary caps to tort actions directly against local governments when the bases for such actions are enactments of the General Assembly, state common law, the state constitution, or federal law." 359 Md. at 373–74, 754 A.2d 367. The Court focused on the dichotomy between locally enacted law and state law in concluding that the legislative intent was that the damages cap applies only to actions against employees under the LGTCA and actions against local governments authorized under locally enacted law. Because the legislature clarified, post-*Bennett,* that the LGTCA applied to direct claims against the local government as well as to claims against local government employees, we can no longer infer that the legislature intended to differentiate between locally enacted law and state law, including state constitutional law. Rather, we conclude that, by broadening the liability for local governments post-*Bennett,* the legislature intended the LGTCA damages cap to apply to damages for constitutional violations as well.

**14.** In *Rounds,* we held that the LGTCA's notice requirement applied to claims for state constitutional violations brought against the Maryland

[H]owever, in multiple cases, Maryland appellate courts have indicated as much in *dicta. See Ashton v. Brown,* 339 Md. 70, 107 n. 19, 660 A.2d 447 (1995) ("[T]here is no exception in the [LGTCA] for constitutional torts. In fact, there is no exception in the statutory language for any category of torts."); *Thomas v. City of Annapolis,* 113 Md.App. 440, 457, 688 A.2d 448 (1997) ("The LGTCA . . . applies to all torts without distinction, including . . . constitutional torts." (Footnote omitted)); *Ransom v. Leopold,* 183 Md.App. 570, 579, 962 A.2d 1025 (2008) (same) (quoting *Thomas,* 113 Md.App. at 457, 688 A.2d 448); *Hansen v. City of Laurel,* 420 Md. 670, 682 n. 7, 25 A.3d 122 (2011) ("[T]he plain language . . . of the LGTCA indicates a legislative intent to make the notice requirement broadly applicable to tort actions brought directly against local governments[.] Whether the [LGTCA notice] requirement applies to constitutional claims, which plaintiffs may bring directly against local governments, remains uncertain. We have intimated as much, however." (Citing *Longtin II,* 419 Md. 450, 19 A.3d 859; *Ashton,* 339 Md. at 107 n. 19, 660 A.2d 447) (omission in original)); *see also Longtin II,* 419 Md. at 521, 19 A.3d 859 (Harrell, J., concurring in part and dissenting in part) ("[W]e recognize, at least implicitly, that the LGTCA procedural requirements (e.g., notice) apply also to constitu-

---

National Capital Park and Planning Commission, emphasizing that the Commission was both "a 'local government' subject to the LGTCA" and "a State agency entitled to sovereign immunity." *Rounds, supra,* 214 Md.App. at 106–07 n. 10, 75 A.3d 987. We explicitly did not reach the issue of whether the LGTCA notice requirement applied to claims against other local government entities, explaining:

> We do not decide whether the LGTCA notice requirement would apply where a plaintiff sues a different local government for a state constitutional tort. We observe that "Maryland law provides no immunity for municipalities and other local government entities from suits based upon violations of state constitutional rights." *Ashton,* 339 Md. at 101, 660 A.2d 447. Additionally, with respect to local governments other than the Commission, we do not reach our *dicta* in *Longtin I,* 190 Md.App. at 115–21, 988 A.2d 20, in which this Court observed the "[u]neasy [f]it" between state constitutional torts and the LGTCA notice requirement.

*Id.*

tional tort claims." (Citing *Ashton,* 339 Md. at 107 n. 19, 660 A.2d 447)); *Luy v. Balt. Police Dep't,* 326 F.Supp.2d 682, 693 (D.Md.2004), *aff'd,* 120 Fed.Appx. 465 (4th Cir.2005) ("[T]he notice requirements of the LGTCA apply to intentional and constitutional torts." (Citing *Curtis v. Pracht,* 202 F.Supp.2d 406, 414 (D.Md.2002), in turn citing *Thomas,* 113 Md.App. at 457, 688 A.2d 448)).

In multiple cases involving state constitutional torts, by deciding whether the LGTCA notice requirement would bar plaintiffs' claims, Maryland appellate courts have discussed—albeit without expressly deciding—whether the LGTCA notice requirement applies to state constitutional torts. *See, e.g., Longtin I,* 190 Md.App. 97, 988 A.2d 20; *Longtin II,* 419 Md. 450, 19 A.3d 859; *Wilbon v. Hunsicker,* 172 Md.App. 181, 913 A.2d 678 (2006), *cert. denied,* 398 Md. 316, 920 A.2d 1060 (2007); *White v. Prince George's Cnty.,* 163 Md.App. 129, 877 A.2d 1129, *cert. denied,* 389 Md. 401, 885 A.2d 825 (2005); *Chappelle v. McCarter,* 162 Md.App. 163, 873 A.2d 458 (2005).

214 Md.App. at 101–102, 75 A.3d 987.

Indeed, we have refused to permit tort claims, including those involving state constitutional violations, to proceed when a plaintiff has not complied with the notice requirements of the LGTCA. *See Ransom, supra,* 183 Md.App. 570, 962 A.2d 1025 (affirming the circuit court's dismissal of state constitutional claims for failure to comply with the LGTCA notice requirements); *White, supra,* 163 Md.App. 129, 877 A.2d 1129 (same). Critically, the Court of Appeals has suggested that the LGTCA notice requirement applies to constitutional claims in *Longtin II,* explaining that constitutional claims arising from a false arrest and imprisonment share an accrual date for purposes of the notice provision with the underlying tort claims of false arrest and imprisonment. 419 Md. at 480, 19 A.3d 859. Therefore, it would be unreasonable to interpret the notice provision of the LGTCA as applicable to constitutional claims, while excluding constitutional claims from the applicability of the damage cap provision of the same statute. This provides further support for our conclusion that the

LGTCA damages cap applies to common law tort claims and constitutional claims alike.

In sum, based upon the statutory language, case law, and legislative history, we see no basis to conclude that the legislature intended that the LGTCA damages cap not apply to claims involving constitutional violations. Accordingly, we hold, as a matter of statutory interpretation, that the LGTCA damages cap applies to the claims in the instant case.

**B. Whether the application of the LGTCA damages cap to a constitutional claim violates Article 19 of the Maryland Declaration of Rights.**

 Having held that the LGTCA cap applies to constitutional claims, including the Article 24 claims asserted in the instant case, we next turn to whether the application of the LGTCA damages cap to damages awarded for the constitutional violations is an abridgement of the rights guaranteed under Article 19 of the Maryland Declaration of Rights.

Article 19 of the Maryland Declaration of Rights provides:
That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land.

The Court of Appeals addressed the history of Article 19 at length in *Jackson v. Dackman*, 422 Md. 357, 30 A.3d 854 (2011), as follows:
Article 19 was part of the original Maryland Declaration of Rights adopted in 1776, although it was then designated as Article 17 of the Declaration of Rights. Except for one word, the wording today is identical to the 1776 wording. All of the original state constitutions adopted at the time of the Revolutionary War, except Virginia's and North Carolina's, contained provisions like Article 19. While the United States Constitution contains no comparable provision, today the constitutions of 39 states have clauses similar to Article 19. These provisions, often referred to as 'Reme-

dy Clauses' or 'Open Courts Clauses' or 'Access to Courts Clauses,' are based on Chapter 40 of the Magna Carta or, more particularly, Lord Coke's interpretation of Chapter 40.

*Id.* at 376, 30 A.3d 854 (quoting *Piselli v. 75th Street Medical,* 371 Md. 188, 204–05, 808 A.2d 508 (2002)) (internal quotations, citations, and footnotes omitted). The Court of Appeals explained that "Article 19 generally protects two interrelated rights: (1) a right to a remedy for an injury to one's person or property; (2) a right of access to the courts." *Id.* (internal quotation omitted). The Court, again quoting *Piselli, supra,* 371 Md. at 205–206, 808 A.2d 508, "set forth some of the specific applications of Article 19":

> We have held that it is a basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong. Where a person clearly has a right to money or property under a statute or common law principle, and no statute specifically provides for a remedy, Article 19 guarantees a common law remedy to enforce the right. The principle that one has a Maryland constitutional right to judicial review of adjudicatory administrative decisions is based, in part, upon Article 19. Article 19 ordinarily precludes retrospective legislation abrogating accrued causes of action.
>
> Apart from these types of specific holdings with respect to Article 19, the constitutional provision generally prohibits unreasonable restrictions upon traditional remedies or access to the courts but allows the Legislature, pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts.

*Dackman, supra,* 422 Md. at 377–78, 30 A.3d 854 (internal quotations and citations omitted).

■ The Court of Appeals explained further that "[m]any restrictions upon judicial remedies, challenged under Article 19, have been upheld by this Court, while others have been invalidated." *Id.* at 378, 30 A.3d 854. Applications "of tradi-

tional or well-established immunities from suit" do not violate Article 19. *Id.* "Article 19, however, 'precludes the Legislature from immunizing from suit both the government and the governmental official involved . . . when the cause of action is based upon a violation of state constitutional rights.'" *Id.* (quoting *Piselli, supra,* 371 Md. at 207, 808 A.2d 508). Other restrictions have been held permissible under Article 19, including certain notice provisions as well as mandatory arbitration prior to filing in court. *Id.* at 379, 30 A.3d 854. The imposition of "a reasonable limit" upon noneconomic damages is permissible under Article 19, as are 5, 10, and 20-year statutes of repose for certain tort actions. *Id.* The Court has also provided that "the Legislature may *ordinarily* substitute a statutory remedy . . . for a common law remedy without violating Article 19 of the Declaration of Rights or other Maryland constitutional provisions." *Id.* (quoting *Robinson v. Bunch,* 367 Md. 432, 446–47, 788 A.2d 636 (2002)). The issue, therefore, is whether the LGTCA damages cap is reasonable under Article 19.

Prior analysis of the limitation upon recoverable noneconomic tort damages pursuant to CJP § 11–108 is particularly instructive.[15] It is well established that the § 11–108 cap does

---

**15.** Section 11–108 provides in relevant part:

(b)(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(2)(i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

(ii) The limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

(3)(i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may

not violate Article 19. The Court of Appeals was first presented with this issue in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), in which the Court explained:

> In our view, the limitation upon recoverable noneconomic tort damages under § 11–108 of the Courts and Judicial Proceedings Article does not amount to a restriction upon access to the courts. There is a distinction between restricting access to the courts and modifying the substantive law to be applied by the courts. The plaintiffs' cause of action based on negligence was not abolished by § 11–108. Instead, § 11–108 simply modifies the law of damages to be applied in tort cases. While the right to recover noneconomic damages exceeding $350,000 was abrogated, this change in the substantive law is not a restriction upon access to the courts.

325 Md. at 366, 601 A.2d 102 (1992). Similarly, the LGTCA damages cap does not modify access to the courts. Instead, it modifies the law of damages applied in cases involving claims against local governments.

The Espinas point to *Dackman, supra,* in support of their assertion that a cap of $200,000 per claim and $500,000 per occurrence is unreasonable. In *Dackman,* the Court of Appeals held that the substituted remedy under the Reduction of Lead Risk in Housing Act ("the Act") was invalid under Article 19. 422 Md. at 383, 30 A.3d 854. The Act provided that, when a landlord complied with certain requirements to properly maintain rental property, the maximum amount payable to a lead poisoned child was $17,000.[16] Regarding the

---

not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award.

16. The landlord was required to provide a "qualified offer" of up to $17,000 to a "person at risk" or lead poisoning, representing up to $7,500 for medically necessary treatments and $9,500 for relocation benefits. *Dackman, supra,* 422 Md. at 364–65, 30 A.3d 854. The Act further provided that if the qualified offer was accepted, the landlord was released from all potential liability, and if the qualified offer was made but rejected by the person at risk, the landlord was not liable for

adequacy of the remedy provided by the Act, the Court explained:

> For a child who is found to be permanently brain damaged from ingesting lead paint, proximately caused by the land-lord's negligence, the maximum amount of compensation under a qualified offer is minuscule. It is almost no compensation. Thus, the remedy which the Act substitutes for a traditional personal injury action results in either no compensation (where no qualified offer is made or where a qualified offer is rejected) or drastically inadequate compensation (where such qualified offer is made and accepted).

*Id.* at 382, 30 A.3d 854. The Court also emphasized that there was no exception in the Act for an injured child to bring her own personal injury action once reaching the age of majority, observing that "the grant of immunity in the present case leave[s] a negligently injured child without a remedy." *Id.* The Court noted that it could not "countenance a result that would leave the only innocent victim . . . uncompensated for his or her injuries," *id.* (quoting *Piselli, supra,* 371 Md. at 216, 808 A.2d 508 (quoting *Johns Hopkins Hospital v. Pepper,* 346 Md. 679, 695, 697 A.2d 1358 (1997))). Accordingly, the Court held that "the immunity provisions of the Reduction of Lead Risk in Housing Act are invalid under Article 19 of the Maryland Declaration of Rights." *Id.* at 383, 30 A.3d 854.

The LGTCA damages cap is distinguishable from the cap addressed in *Dackman.* The LGTCA damages cap of $200,000 per claim is over ten times the amount of the qualified offer at issue in *Dackman.* Moreover, in *Dackman,* if a qualified offer was rejected, the landlord had full immunity, including immunity against future claims by an injured child once she reaches majority, leaving a lead paint poisoned child with no remedy whatsoever. There is no similar immunity provision in the LGTCA, and plaintiffs injured by a local government may recover up to $200,000 per individual claim. Critically, in cases such as the instant case—in which malice

---

injury or loss caused by ingestion of lead by a person at risk in the affected property. *Id.* at 366–67, 30 A.3d 854.

was established—a plaintiff can recover in full, subject to no immunity or cap, against the local government employee himself. In our view, the LGTCA damages cap is more similar to the § 11–108 cap on noneconomic damages than to the qualified offer and immunity provisions of the Reduction of Lead Risk in Housing Act. As such, the LGTCA damages cap modifies the law of damages applied in cases involving claims against local governments. It does not operate—as the Espinas suggest—as a restriction upon access to the courts. We hold, therefore, that the LGTCA damages cap, as applied to state constitutional claims, does not violate the Espinas' rights under Article 19 of the Maryland Declaration of Rights.[17]

---

**17.** We are also unpersuaded by the Espina's separation of powers and judicial admission arguments. The Espinas point to out of state cases in support of their position that the LGTCA cap, as applied to constitutional claims, is an unconstitutional violation of separation of powers. Particularly, the Espinas point to the Illinois case of *Best v. Taylor Machine Works*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057 (1997), in which the Supreme Court of Illinois struck down a cap on noneconomic damages as an unconstitutional violation of the separation of powers doctrine. We explicitly distinguished *Best* in *Owens–Corning v. Walatka*, 125 Md.App. 313, 335–37, 725 A.2d 579 (1999), *abrogated on other grounds by John Crane, Inc. v. Scribner*, 369 Md. 369, 800 A.2d 727 (2002), finding it inconsistent with the Court of Appeals' opinion in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), and quoting Judge Niemeyer's opinion in *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1331 (D.Md.1989), in which Judge Niemeyer explained:

> [I]f the legislature can, without violating separation of powers principles, establish statutes of limitations, establish statutes of repose, create presumptions, create new causes of action and abolish old ones, then it also can limit noneconomic damages without violating the separations of powers doctrine.

125 Md.App. at 338–39, 725 A.2d 579.

We hold that the same rationale that has been applied to the § 11–108 cap applies to the LGTCA cap in the context of a separation of powers argument, and accordingly, we hold that there is no violation of the separation of powers doctrine. *See, e.g., Univ. of Md. Med. Sys. Corp. v. Malory*, 143 Md.App. 327, 355, 795 A.2d 107 (2001) ("[W]e were presented with [the constitutionality of the Cap under a separation of powers analysis] in Murphy and ... our holding in that case is controlling."); *Edmonds v. Murphy*, 83 Md.App. 133, 150, 573 A.2d 853 (1990), *aff'd*, 325 Md. 342, 601 A.2d 102 (1992) ("[W]e hold that [the Cap] does not violate the separation of powers doctrine embodied in Article 8.").

## C. Application of the LGTCA damages cap.

█ Having concluded that the LGTCA damages cap applies and is constitutional, our next task is to determine whether it was properly applied. Pursuant to CJP § 5–303(a), the circuit court reduced the judgment against Prince George's County from $11,505,000 to $405,000. Both parties maintain that the circuit court improperly reduced the verdicts under § 5–303(a). The Espinas argue that the assault and shooting of Espina constitute a separate occurrence from the constitutional violation against Manuel. The Espinas further argue that a separate $200,000 cap should have applied for each of the wrongful death claim beneficiaries. The County asserts that all of the claims asserted by the Espinas constitute one individual claim because the claims are based upon the same set of facts. The verdicts, according to the County, should have been reduced to $200,000.

The LGTCA provides, in relevant part, that "the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence." CJP § 5–303(a)(1). The circuit court found that the violation of Espina's constitutional right and the wrongful death of Espina constituted one occurrence and that Estela and Manuel's wrongful death claims were derivative. The circuit court further found that Manuel's constitutional claim constituted an individual claim arising out of the same occurrence. The court reduced the wrongful death award to $200,000 as to Prince George's County. The circuit court further reduced Manuel's award for violation of his constitu-

---

We are also unpersuaded by the Espinas' judicial admission argument. The Espinas contend that, because the County's counsel argued to the jury that Prince George's County would be liable for Jackson's conduct and would "pay the judgment in the case," the County is bound to its "judicial admissions." The Espinas cite no Maryland case directly on point, and we know of no such case. We hold that the County's counsel's statements were insufficient to establish a binding judicial admission to pay the judgment. Moreover, the County has never disputed that it will pay the judgment, subject to the limits of liability provided by § 5–303.

tional rights to $200,000, and left the $5,000 award for economic damages unchanged, resulting in a total award of $405,000.[18]

In *Leake, supra,* 204 Md.App. at 417, 40 A.3d 1127 we explained that "a wrongful death claim [is] aggregated with the claim of the injured person in applying the LGTCA limitation of liability of a local government to $200,000 per an 'individual claim.'" We held in *Leake* that wrongful death claims must be aggregated with an estate's survival action under the LGTCA. Accordingly, the circuit court properly applied *Leake* when it found that Estela and Manuel's wrongful death claims were derivative of Espina's survival claim and limited recovery to $200,000.

■ The County contends that Manuel's constitutional claim is similarly derivative. We disagree. As discussed, *infra,* in section II(G), the jury's verdict finding that Manuel's constitutional rights were violated is reconcilable with the jury's verdict that Manuel was not assaulted. Accordingly, the circuit court did not err in finding that Manuel's constitutional claim was separate and not derivative. Applying the LGTCA cap, the circuit court properly reduced the verdict for Manuel's constitutional claim to $200,000.

■ Finally, we hold that the circuit court erred by awarding $5,000 for economic damages. Unlike the § 11–108 cap, the LGTCA damages cap does not differentiate between economic and noneconomic damages. *See* CJP § 5–303(a). Rather, the LGTCA's $200,000 per claim and $500,000 per occurrence damages cap applies to both economic and noneconomic damages. *Id.* Accordingly, we hold that the total award should have been reduced to $400,000, rather than $405,000.

## II. Cross–Appeal

We now turn to the nine issues asserted by the County in its cross-appeal. We address each of the County's contentions in turn.

---

**18.** The $200,000 award for the wrongful death claim was to be split, 95% to Estela and 5% to Manuel.

### A. The circuit court's denial of the County's motion to dismiss the unlawful pattern and practice claim.

Prior to trial, the circuit court bifurcated the Espinas' claim for unlawful pattern or practice and ordered that the unlawful pattern or practice claim proceed after the trial on all other counts. That claim has not been tried and is currently stayed by the circuit court, pending the outcome of the appeal in this case. Critically, the circuit court granted the County's motion for entry of final judgment. The order certifying the judgment as final did not apply to the unlawful pattern or practice count. Rather, the circuit court found and ordered that "the claims adjudicated at the trial held February 15, 2011 continuing to and including March 16, 2011, are final and totally decided" and "there is no just reason for delay in certifying *those claims as final for purposes for appeal.*" (emphasis added). Accordingly, we are precluded from addressing the Espinas' unlawful pattern and practice claim at this time.

### B. Application of the CJP § 11–108 damages cap.

The County urges that, if the LGTCA damages cap does not apply, we should apply the § 11–108 cap and reduce the noneconomic damages accordingly. Because we hold that the LGTCA damages cap applies and that, pursuant to the LGTCA damages cap, the award is reduced to $400,000, the award represents less than the amount allowable under the § 11–108 noneconomic damages cap. Accordingly, we need not address whether the § 11–108 cap on noneconomic damages applies to constitutional claims.

### C. The circuit court's exclusion of evidence regarding Espina's immigration status and folding pocket knife.

Next, the County asserts that the trial court erred by excluding evidence that Espina had a knife in his pocket and evidence of Espina's undocumented immigration status. Indeed, the County acknowledges—as it must—that there is no indication that Jackson knew of either the knife or Espina's immigration status at the time of the incident.

Regarding the standard of review for evidentiary determinations, the Court of Appeals has explained:

It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded is committed to the considerable and sound discretion of the trial court, and that the abuse of discretion standard of review is applicable to the trial court's determination of relevancy. Maryland Rule 5–402, however, makes it clear that the trial court does not have discretion to admit irrelevant evidence. While the clearly erroneous standard of review is applicable to the trial judge's factual finding that an item of evidence does or does not have probative value, the de novo standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not of consequence to the determination of the action.

*Ruffin Hotel Corp. of Maryland, Inc. v. Gasper,* 418 Md. 594, 619–20, 17 A.3d 676 (2011) (internal quotations and citations omitted). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401.

The County asserts that both the knife and Espina's immigration status were relevant to establish Espina's "possible motive" for "violently resisting Officer Jackson's efforts, to support Jackson's version of events, and to show the jury how and why the incident escalated to the point of the shooting." The County concedes, however, that Jackson was never aware of Espina's knife or immigration status at any point during the altercation. Moreover, the knife was not discovered until *after Espina's death.* Although Jackson testified that Espina resisted his attempts to arrest him, there is no indication in the record that Espina's "possible motive" for resisting arrest was an issue in the case, nor did this evidence have any tendency to make the existence of any fact of consequence to the determination of the action more or less probable.[19] We fail to

---

**19.** The County's reliance on *Ayala v. State,* 174 Md.App. 647, 923 A.2d 952 (2007) is misplaced. *Ayala* involved the admission of a criminal

understand how information—fully unknown to Jackson at the time of the incident, and in no way considered by Jackson at any point—is in any way relevant in the instant case. Evidence suggesting that Espina did, in fact, resist arrest is certainly relevant. Indeed, Jackson testified that Espina resisted arrest. Evidence suggesting "possible" reasons for resistance, however, was not relevant. We agree with the circuit court's determination that neither Espina's knife nor Espina's immigration status were relevant.[20]

### D. The circuit court's admission of evidence of Jackson's involvement in two previous stops of two other individuals.

The County's next contention is that the circuit court erred by allowing the Espinas to introduce evidence of two prior incidents in which Jackson was involved in violent encounters with members of the public. The County argues that such evidence was not relevant and should have been excluded.

---

defendant's gang affiliation in order to demonstrate his motive for committing a "brutal and seemingly senseless killing." *Id.* at 663–64, 923 A.2d 952. We noted that we were establishing "no bright-line rule as to the admissibility of gang evidence in Maryland" but that in that particular case, the circuit court "properly exercised its discretion" because "the evidence was highly probative in establishing motive and was not unduly prejudicial under the circumstances." *Id.* at 664, 923 A.2d 952. Unlike *Ayala,* the County here argued the evidence should be admitted not to prove the motive of a criminal defendant, but to prove the possible motive of a victim of excessive force.

20. We also observe that, assuming *arguendo* the knife and immigration status had marginal relevance, the circuit court would have been well within its discretion to exclude the evidence under Maryland Rule 5–403, which provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403. Evidence of Espina's knife and immigration status were likely to cause significant unfair prejudice. Although prejudice was argued to the circuit court, the circuit court determined that the evidence was not relevant and, accordingly, did not reach the balancing test of Rule 5–403.

At trial, the Espinas presented four motions to admit evidence of prior, violent encounters between Jackson and members of the public. The circuit court denied the first three motions without prejudice, but granted the fourth motion, finding that Jackson had opened the door to allow the evidence by testifying about his practices as a police officer and his habit and practice of typically following the various levels of the continuum of force. The Espinas introduced evidence of a violent encounter between Jackson and Sean Leake, which occurred less than three months prior to the incident that resulted in Espina's death, and evidence of a violent encounter between Jackson and Jacques Ross, which occurred twenty-one days prior to the incident that resulted in Espina's death.

Specifically, Ross testified regarding an encounter he had with Jackson on July 27, 2008. Ross learned from his brother, who had been driving Ross's car, that his car had been impounded for a taillight infraction. Jackson was the officer who had pulled over Ross's brother and impounded the vehicle. Ross, with his brother in the vehicle, drove to a nearby fire station, where he saw Jackson, and asked the officer if he could help locate the impounded car. At this point, Ross was unaware that Jackson was the same officer who had pulled his brother over earlier and impounded that car. Recognizing Ross's brother, Jackson began to yell at Ross's brother, "Oh, so you've come back, you've come back for some trouble?" and "You want a fucking piece of me? I'm going to give you what you fucking want." Jackson grabbed Ross by the neck and forcibly removed him from the vehicle, and while Ross was being questioned by another officer, Jackson jumped on him and kicked Ross's legs. After Jackson's supervisor arrived, the altercation ended. Ross sought medical attention and was not charged with any crime. Jackson used very similar justifications to explain his conduct in both the Ross and Espina incidents. In both instances, Jackson said he was "outnumbered" and at a "disadvantage."

Regarding the Sean Leake incident, Leake was unavailable for trial, but a recording from Jackson's police cruiser was

introduced into evidence. The recording captured part of a violent encounter between Jackson and Leake on May 25, 2008. During a traffic stop, Jackson demanded that Leake step out of his car. Then, after Leake indicated that he was stuck in the vehicle, Jackson punched Leake in the face twice and wrestled him to the ground. Jackson testified that Leake hit him first, but that was not visible on the recording. Again, Jackson used very similar justifications to explain his conduct in both the Leake and Espina incidents. In both instances, Jackson said he was "outnumbered." Jackson also said that both Leake and Espina took a "combative stance."

In a civil case, the admissibility of prior bad acts evidence is governed by Maryland Rule 5–403. *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper,* 418 Md. 594, 625, 17 A.3d 676 (2011) ("[Maryland] Rule 5–404(b) [is] applicable only to evidence offered by the State against the defendant in a criminal case. In civil cases, whether the evidence at issue is offered by a plaintiff or by a defendant, the admissibility of relevant evidence that presents the possibility of unfair prejudice is to be dealt with pursuant to Md. Rule 5–403.").[21] Under Rule 5–403, relevant evidence is excluded only if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We review a trial court's application of the Rule 5–403 for an abuse of discretion. The Court of Appeals has explained:

> When weighing the probative value of proffered evidence against its potentially prejudicial nature, an abuse of discretion in the ruling may be found where no reasonable person would share the view taken by the trial judge. That is to say, an abuse of discretion occurs when a decision is well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems

---

21. We note that the trial in this case was held before *Ruffin* was decided, and the circuit court considered both Rules 5–404(b) and 5–403.

minimally acceptable. Thus, a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.

*Consolidated Waste Industries, Inc. v. Standard Equipment Co.*, 421 Md. 210, 219, 26 A.3d 352 (2011) (internal quotations and citations omitted).

We hold that the circuit court did not err in finding the prior conduct relevant. The evidence was relevant to Jackson's motive, intent, and *modus operandi*, as well as to rebut Jackson's testimony that, as a police officer, he followed the various levels of the continuum of force. The evidence was not admitted "to prove that [Jackson] acted in accordance with the character or trait on a particular occasion," as prohibited by Maryland Rule 5–404(a)(1).

Nor did the circuit court abuse its discretion in determining that the probative value of the evidence was not substantially outweighed by unfair prejudice pursuant to Rule 5–403. The circuit court afforded the County the opportunity to present testimony and admit evidence in order to explain these incidents. Indeed, two witnesses (in addition to Jackson) testified for the County regarding the Leake incident—both of whom supported Jackson's version of events. We cannot say that the circuit court's decision to admit the evidence was "removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Consolidated Waste Industries, Inc. v. Standard Equipment Co., supra,* 421 Md. at 219, 26 A.3d 352. Accordingly, we hold that the circuit court did not err nor abuse its discretion in admitting the evidence of Jackson's prior violent encounters with members of the public.

E. **The Espinas' assertion of excessive force under Article 24.**

The County asserts that, as a matter of law, the Espinas' Article 24 claim should not have been submitted to

the jury because such a claim can only be asserted via an Article 26 claim. We disagree.

We have explained that claims brought under Article 24 of the Maryland Declaration of Rights are analyzed utilizing the same test as claims brought under Article 26.[22] *Randall v. Peaco*, 175 Md.App. 320, 330, 927 A.2d 83 (2007) ("[A] claim of excessive force brought under Article 24 is analyzed in the same manner as if the claim were brought under Article 26. In both instances, the claim is assessed under Fourth Amendment jurisprudence, rather than notions of substantive due process, precisely like the analysis employed for claims brought under 42 U.S.C. § 1983."). The case of *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118 (2000), is particularly instructive. In *Okwa*, an individual brought an Article 24 claim alleging excessive force during an arrest; he did not assert an Article 26 claim. The Court of Appeals reversed the circuit court's grant of summary judgment to the defendants, holding that excessive force could provide a basis for an Article 24 claim, and that the reasonableness of the police officer's conduct should be assessed utilizing the standard put forth by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *Okwa, supra*, 360 Md. at 203–05, 757 A.2d 118.

The County misstates the law on this issue. Simply because an Article 24 claim is analyzed utilizing the Article 26/Fourth Amendment reasonableness standard articulated in *Graham*, a claimant is not precluded from asserting an Article 24 claim. Rather, an Article 24 claim is viable if a claimant can prove excessive force under the *Graham* test. *See, e.g., Okwa, supra*, 360 Md. at 203–05, 757 A.2d 118; *Hines v. French*, 157 Md.App. 536, 574–75, 852 A.2d 1047 (2004) ("The standards for analyzing claims of excessive force are the same under Arti-

---

**22.** Article 24 of the Maryland Declaration of Rights provides:

[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

cles 24 and 26 of the Maryland Constitution as that under the Fourth Amendment of the United States Constitution."); *Ta-vakoli–Nouri v. State*, 139 Md.App. 716, 730, 779 A.2d 992 (2001) ("Such excessive force could be a violation of Article 24 of the Maryland Declaration of Rights . . . .") Accordingly, we hold that the trial court did not err in submitting the Espinas' Article 24 claim to the jury.

### F. Sufficiency of the evidence to establish malice.

 The County's next contention is that the evidence presented at trial was insufficient to establish "actual malice," and that Jackson should retain his statutory immunity.[23] We are unpersuaded.

Regarding the evidence required to support a finding of malice, we have explained:

> In the qualified immunity context, the Court of Appeals [has] affirmed that "malice" has an "actual malice" meaning, and requires a determination of whether the arresting officer's "conduct, given all of the existing and antecedent circumstances, was motivated by ill will, [or] by an improper motive . . . . [T]hat motive or animus may exist even when the conduct is objectively reasonable." *Shoemaker [v. Smith]*, 353 Md. [143] at 164, 725 A.2d 549 [ (1999) ]. Malice can be established by proof that the officer " 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.' " *Id.* at 163, 725 A.2d 549 (quoting *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159 (1985), *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985)).

*Thacker v. City of Hyattsville*, 135 Md.App. 268, 300, 762 A.2d 172 (2000). In the instant case, the jury rendered four

---

**23.** CJP § 5–507 provides:

An official of a municipal corporation, while acting in discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

separate findings of malice. The County argues that "[t]he evidence at trial established, at best, mutual combat," and that the evidence "established no more than the two men struggled and that, eventually, [Jackson] discharged his firearm as part of the struggle, killing [Espina]." Such an assessment of the evidence is simply not supported by the record.

We will not restate the details of the testimony laid out in the factual background section, *supra*, but we nevertheless identify a few key segments of testimony to illustrate the copious evidence presented to support a finding of malice. Several eyewitnesses testified that Jackson attacked Espina with no justification, yelled profanity in an angry voice, and ultimately shot and killed Espina when he was unable to resist or fight back. Noe Cordova testified that, when Jackson entered the apartment, he had a furious expression on his face and used the phrase "mother fucker." Cordova further testified that Jackson continued to strike Espina despite Espina's screams. Elvia Rivera testified that Jackson beat Espina with his baton and that Espina did not resist or fight back in any way. Rivera further testified that Jackson yelled the word "fuck" many times and used a mean and angry voice, and that Jackson shot Espina while he was crouched on the floor. Manuel testified that Jackson repeatedly knocked Espina down when Espina tried to get up. Manuel further testified that he did not see Espina fight back, and that after the shooting, when Manuel asked Jackson to call an ambulance, Jackson responded by saying, "shut the fuck up." Rivera and Estela both identified Jackson's voice on the 9–1–1 tape saying "shut the fuck up" and "fuck you." All of the eyewitnesses, other than Jackson, testified that they never saw a group of five to six men surrounding Jackson. There was also physical, medical, and forensic evidence presented enabling the jury to readily reach a finding of malice. Simply put, we hold that the evidence was more than sufficient to support the jury's finding of malice.

### G. The jury's verdict regarding Manuel's claims.

The County next contends that, because the jury found that Jackson did not assault or batter Manuel, its

finding that Jackson violated Manuel's rights under Article 24 of the Maryland Declaration of Rights is irreconcilably inconsistent. We hold that the verdicts can easily be reconciled.

The Court of Appeals has explained that irreconcilable inconsistent jury verdicts cannot be allowed to stand in civil cases. *Southern Management Corp. v. Taha*, 378 Md. 461, 487–89, 836 A.2d 627 (2003). In *Taha*, a jury found a former corporate employer liable to a terminated employee for malicious prosecution but found former coworkers, who were the alleged tortfeasors, not liable. *Id.* at 495, 836 A.2d 627. The Court of Appeals held that the "judgments reflected irreconcilably inconsistent jury verdicts," and accordingly, held that the judgment must be set aside. Unlike *Taha*, the verdicts in the instant case can be reconciled.

At trial, there was evidence presented that Manuel was prevented from providing CPR to his dying father because he was handcuffed and arrested.[24] Manuel was also charged with criminal assault of Jackson, based upon information provided by Jackson.[25] The jury could have reasonably determined that Manuel's rights under Article 24 of the Maryland Declaration of Rights were violated when he was required to cease providing CPR to his father, and when he was arrested, imprisoned, and charged with a crime for which the jury could have reasonably concluded there was no basis. Accordingly, we do not find that the jury's verdict is irreconcilably inconsistent.

### H. The verdict sheet.

██ The County's next contention is that the verdict sheet was incorrect as a matter of law because Question 9 (which asked the jury whether Jackson was liable for wrongful death), did not identify the offense that caused Espina's death.

---

24. The evidence established that Manuel was arrested by Officer Freeman, at the direction of Jackson.

25. Although not relevant to our analysis, all criminal charges against Manuel were ultimately dropped.

We have explained that "the decision to use a particular verdict sheet 'will not be reversed absent abuse of discretion.'" *Applied Indus. Techs. v. Ludemann,* 148 Md.App. 272, 287, 811 A.2d 845 (2002). We hold that there was no such abuse of discretion in the instant case. Question 1 on the verdict sheet explicitly asked whether Jackson violated Espina's constitutional rights, to which the jury answered, "yes." Question 2 explicitly asked whether Jackson acted in self-defense, to which the jury answered, "no." Question 3 explicitly asked whether Jackson acted with actual malice, to which the jury answered, "yes." Question 5 explicitly asked whether Jackson assaulted and battered Espina, to which the jury answered, "yes." The verdict sheet was not required to repeat the same list of torts and defenses in Question 9. The jurors were properly instructed as to the elements of each claim brought on behalf of Espina, Estela, and Manuel, and the record does not reflect that the jury was confused in any way. Indeed, the verdict sheet used by the circuit court was neither legally incorrect nor confusing.

## I. Excessiveness of damages

The County's final contention is that the damages were plainly excessive. This issue is moot in light of our conclusion regarding the applicability of the LGTCA damages cap.[26]

For the reasons noted, the LGTCA damages cap limits the Espinas' total recovery. The LGTCA cap applies to claims for state constitutional violations. Further, the application of the LGTCA cap to constitutional claims is not a violation of Article 19 nor a violation of the separation of powers doctrine. Applying the cap, the jury verdict, as to Prince George's County, is reduced from $11,505,000 to $400,000. Finally, we are unpersuaded by any of contentions raised by the County in its cross-appeal.

---

**26.** We note, however, that any excessiveness of the verdict falls squarely within the discretion of the trial court. *John Crane, Inc. v. Puller,* 169 Md.App. 1, 52, 899 A.2d 879 (2006) ("[T]he granting of a remittitur ... based on the alleged excessiveness of the verdict for economic loss are matters entrusted to the wide discretion of the trial judge.").

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED IN PART AND RE-VERSED IN PART. CASE REMANDED TO THE CIR-CUIT COURT TO ENTER JUDGMENT AGAINST PRINCE GEORGE'S COUNTY IN THE AMOUNT OF $400,000. COSTS TO BE PAID 50% BY APPELLANTS AND 50% BY APPELLEES.